# EXHIBIT H

# Deposition of Andrew Perrong

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              DISTRICT OF UTAH, CENTRAL DIVISION
 3     ------------------------------------------------
       CRAIG CUNNINGHAM, ROBERT  )
 4     HOSSFELD and ANDREW       ) Case No.:
       PERRONG, on behalf of     )  2:19-cv-00568-DBB-CMR
 5     themselves and other      )
       similarly situated,       )
 6                               )
            Plaintiffs,          )
 7                               ) Videotaped
         vs.                     ) Deposition of:
 8                               )
       VIVINT, INC., and DSI     ) ANDREW PERRONG
 9     DISTRIBUTING, INC., dba   )
       DSI SYSTEMS,              )
10                               )
            Defendants.          ) Judge David B. Barlow
11     _____)
12
13                  June 9, 2021 - 9:33 a.m.
14
15              C O N F I D E N T I A L
16
17
18      Proceedings recorded via Zoom teleconference and
       transcribed simultaneously via stenographic means
19            by reporter Marsha Beuchert, RPR
20
21
22
23
24
25
```

Page 1

CONFIDENTIAL

```
 1                A P P E A R A N C E S
 2    For the Plaintiff:
              Anthony I. Paronich
 3            PARONICH LAW, P.C.
              350 Lincoln Street
 4            Suite 2400
              Hingham, MA 02043
 5            Tel: 508-221-1510
              Email: anthony@paronichlaw.com
 6
 7    For the Defendant Vivint, Inc.:
              Nathan R. Marigoni
 8            Melanie Vartaedian
              BALLARD SPAHR, LLP
 9            201 South Main Street
              Suite 800
10            Salt Lake City, Utah 84111
              Tel: 801.531.3000
11            Email: marigonin@ballardspahr.com
12    For the Defendant DSI Distributing:
              Kathleen M. Liuzzi
13            CHRISTIANSEN LAW, PLLC
              311 South State Street
14            Suite 250
              Salt Lake City, Utah 84111
15            Tel: 801.716-7016
              Email: kathe@skclawfirm.com
16
      Also Present:
17            Bob Popovich
              Craig Cunningham
18
19                   I N D E X
20    ANDREW PERRONG                          PAGE
21      Examination by Mr. Marigoni          6, 264
22      Examination by Ms. Liuzzi               259
23
24
25
```

Page  2

CONFIDENTIAL

```
 1   That's disclosed -- if the case proceeds to something

 2   where a court -- you know, that's open and disclosed,

 3   and the name that I used is written in the pleadings.

 4        Q.   Okay.  What is the highest level of

 5   education you've currently completed?

 6        A.   Currently I have a Ph.D. in philosophy.

 7        Q.   And what school did you obtain that degree

 8   from?

 9        A.   The Catholic University of America.

10        Q.   And when did you obtain that degree?

11        A.   2019.

12        Q.   How long is the program for that degree?

13             (Audio interruption.)

14             MR. PARONICH:  Was that me or Andrew?

15             THE WITNESS:  It was a four-year program.

16             MR. PARONICH:  Just hold up a bit, Andrew,

17   because you broke up there.  Could you give it a

18   test?

19             THE WITNESS:  Test.  Can you hear me?

20             MR. PARONICH:  Sorry.  I didn't mean to cut

21   you off.  Do you have the same issue I did?

22             MR. MARIGONI:  Yeah.  Same issue.

23        Q.   BY MR. MARIGONI:  Can you make sure you

24   repeat your answer from the beginning?  I don't know

25   that we captured it.
```

CitiCourt, the Reporting Group                    801-532-3441
A Veritext Company                        www.veritext.com

CONFIDENTIAL

1        A.   It was a four-year program.

2        Q.   Did you obtain any degree prior as a

3    prerequisite to that program?

4        A.   I completed my bachelor's simultaneously.

5        Q.   And was that from the same university?

6        A.   Yes.

7        Q.   Is that university located in Washington,

8    D.C.?

9        A.   Yes.  It's also from the Catholic

10   University of America.

11       Q.   When did you graduate high school?

12       A.   2015.

13       Q.   Are you currently attending law school?

14       A.   Yes.

15       Q.   What school?

16       A.   Temple University Beasley School of Law.

17       Q.   Where is that located?

18       A.   Philadelphia, Pennsylvania.

19       Q.   And what is your anticipated date of

20   graduation?

21       A.   2023.

22       Q.   And how much of that program have you

23   completed?

24       A.   Two years.

25       Q.   How many years is that program?

CONFIDENTIAL

```
 1          A.    Four.
 2          Q.    Is that a part-time or full-time program?
 3          A.    It's full-time, but evening division.
 4          Q.    Are you currently in any classes for that
 5   program right now?
 6          A.    What do you mean by "currently"?
 7                MR. PARONICH:  Sorry, Andrew, if you could
 8   give me a minute.  Objection as to form.  But you can
 9   answer.
10          Q.    BY MR. MARIGONI:  Is an academic quarter or
11   semester currently in session for you?
12          A.    No.
13          Q.    What was your first year GPA?
14          A.    4.0.
15          Q.    And your second year?
16          A.    4.0.
17          Q.    And what classes are you registered for for
18   your next academic quarter or semester?
19          A.    Registration is not opened for next
20   semester yet.
21          Q.    What kind of lawyer do you intend to be
22   when you graduate?
23          A.    I'm still trying to keep my options open,
24   but potentially consumer protection.
25          Q.    Do you intend to be a litigator?
```

CitiCourt, the Reporting Group                801-532-3441
A Veritext Company                          www.veritext.com

CONFIDENTIAL

```
 1        A.    I think part of that is litigation.  So if

 2    you say "litigator," I think that's part of it.

 3        Q.    How are you paying for law school?

 4        A.    I am currently on a scholarship for all but

 5    $5,000 a year.

 6        Q.    Are you taking any student loans?

 7        A.    No.

 8        Q.    Who pays the balance that's not covered by

 9    scholarship?

10        A.    I do.

11        Q.    And do you have an internship or legal job

12    this summer?

13        A.    Yes.

14        Q.    With who?

15        A.    With the West Virginia Attorney General

16    Division of Consumer Protection.

17        Q.    What are you doing there?

18        A.    I believe my official title was I am a

19    Steiger Fellow.  So the program is run for the

20    American Bar Association Steiger Fellowship Program

21    for students -- law students that are interested in

22    consumer protection work.

23        Q.    Is that a paid internship?

24        A.    I don't think it's paid, per se.  There's a

25    stipend.
```

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company                  www.veritext.com

CONFIDENTIAL

```
 1        Q.    How much is that stipend?

 2        A.    $6,000.

 3        Q.    Is that 6,000 for the course this summer?

 4        A.    Yes.

 5        Q.    Do you have any other internship or legal

 6   work you'll be doing this summer?

 7        A.    No.

 8        Q.    Aside from that internship, are you

 9   currently employed?

10        A.    I am self-employed.

11        Q.    And what's the name of your company?

12        A.    Andy Media.

13        Q.    What does Andy Media do?

14        A.    So Andy Media currently is a computer

15   services business that provides managed computer and

16   technical services to small and medium businesses.

17        Q.    And are you the -- let me ask that another

18   way.  Strike that question.

19              Do you consider yourself an employee of

20   Andy Media?

21        A.    I'm a sole proprietor.  I am its sole

22   employee.

23        Q.    So there are no other employees at Andy

24   Media?

25        A.    No.
```

CitiCourt, the Reporting Group                801-532-3441
A Veritext Company                            www.veritext.com

CONFIDENTIAL

1      Q.   How many hours a week do you perform work

2   as or for Andy Media?

3      A.   It will vary wildly.

4      Q.   How about a monthly average?

5   ██  ████████████████████████

6   ██  ██████████████████████████████

7   ██████████████████████████

8   ██  ██████████

9   ██  ████████████████

10  ██  ████████████████████

11     Q.   What work would it differ for?  What type

12  of work?

13     A.   Emergencies, nights, weekends, simple

14  remote work.

15     Q.   For emergencies, nights, and weekends,

16  would the rate be higher?

17     A.   Yes.

18     Q.   For simple remote work would the rate be

19  lower?

20     A.   Yes.

21     Q.   What would the remote work rate be?

22  ██  ████████████████████████████

23  ████████████████

24     Q.   For the emergency nights and weekends rate?

25     A.   Depending on the client and the time,

Page 22

CONFIDENTIAL

1   ████████████████████████████████

2      Q.   And approximately how much was Andy Media's

3   revenue last month?

4   ██   ████████████████████████████████

5   ████████████████████████████████████

6   ████████████████████████████████████

7   ████████████████████████████████

8      Q.   Have you done your 2020 taxes?

9      A.   Yes.

10     Q.   What was your revenue associated with Andy

11  Media for 2020?

12  ██   ██████████████████████████████

13  ████████████████████████

14     Q.   What was your gross revenue for Andy Media

15  for 2019?

16  ██   ████████████████████████████████████

17  ████████████

18     Q.   Have you ever worked -- other than your

19  current internship, have you ever worked for someone

20  else?

21     A.   I think it's a little vague.  When you mean

22  "work," I've been -- usually in Andy Media I am a

23  1099 contractor, so if that's work then I've worked,

24  in a sense, for my clients.  But other than that I

25  haven't been a W-2 employee, no.

CONFIDENTIAL

1       Q.    Have you ever been convicted of a crime?

2       A.    No.

3       Q.    Have you ever been accused of a crime?

4       A.    No.

5       Q.    Have you ever been arrested?

6       A.    No.

7       Q.    Have you ever filed for bankruptcy?

8       A.    No.

9       Q.    All right.  Slight change of gears.  What

10  have you done to prepare for today's deposition?

11      A.    I spoke with my attorneys, and I reviewed

12  some of the documents which have been filed in this

13  case.  I also reviewed some of the production, which

14  has been produced in this case.

15      Q.    Okay.  Did you review the documents that

16  you produced in this case?

17      A.    Yes.

18      Q.    And I don't want to know what you talked to

19  your attorney about, but when did you talk to your

20  attorney about this deposition?

21            MR. PARONICH:  Hold on.  You said "when"?

22            MR. MARIGONI:  Yes, when.

23            MR. PARONICH:  Just clarifying.

24            Go ahead, Andy.

25            THE WITNESS:  Throughout the course of last

CONFIDENTIAL

```
 1   week and last night.

 2        Q.   BY MR. MARIGONI:  How long did you meet

 3   with your attorney last night?  Or talk to your

 4   attorney?

 5        A.   Fifteen minutes.

 6        Q.   And in total over the past week, about how

 7   long did you -- have you talked to your attorney

 8   about the deposition?

 9        A.   An hour and a half to two hours.

10        Q.   Okay.  Did you speak with anyone else about

11   the deposition?

12        A.   I spoke with Mr. Cunningham in the presence

13   of my attorney.

14        Q.   Was that on one of the phone calls that you

15   just indicated you spoke with your attorney about the

16   deposition?

17        A.   Yes.

18        Q.   Did you speak with Mr. Hossfeld?

19        A.   No.

20        Q.   Did you speak with any family members?

21        A.   No.

22        Q.   Who knows that you're currently in a

23   deposition right now?

24        A.   Anthony Paranich, Craig Cunningham, and my

25   parents know that I am in a deposition.
```

CitiCourt, the Reporting Group            801-532-3441
A Veritext Company                      www.veritext.com

CONFIDENTIAL

```
 1          Q.    Do you have any documents with you or in
 2    front of you?
 3          A.    No.
 4          Q.    And is anyone in the room with you right
 5    now?
 6          A.    No.
 7          Q.    Do you have a phone or any other electronic
 8    devices with you, aside from the computer you're
 9    using to attend the deposition?
10          A.    No.
11          Q.    Any documents open on the computer that
12    you're using?
13          A.    No.
14          Q.    All right.  I'm going to -- we'll do
15    exhibits the same way we did them yesterday.  Seemed
16    like it worked.  Mr. Perrong, let me know if you have
17    any trouble opening documents.
18          MR. PARONICH:  Did you want to sequentially
19    number from yesterday?  Or we'll just mark Perrong 1?
20    I'm just trying to think of what we're doing in the
21    future with the other deponents.
22          MR. MARIGONI:  I think Perrong 1 is
23    probably the better way to do it.
24          MR. PARONICH:  Okay.
25          MR. MARIGONI:  That way we are not trying
```

Page 26

CONFIDENTIAL

1    to coordinate between transcripts and stuff like

2    that.

3              MR. PARONICH:  Sure.

4              MR. MARIGONI:  I've put a document that

5    I'll ask the reporter to mark as Perrong -- did we

6    lose somebody?

7              MR. PARONICH:  Mr. Cunningham might have

8    dropped off.

9              MR. MARIGONI:  If we could have the exhibit

10   placed in the chat marked as Perrong No. 1.

11             (EXHIBIT 1 MARKED.)

12             MR. PARONICH:  Andrew, are you able to

13   access and download that?

14             THE WITNESS:  Yes.

15        Q.   BY MR. MARIGONI:  Mr. Perrong, have you

16   seen this document before?

17        A.   Yes.

18        Q.   And when did you first see it?

19        A.   Sometime in late May of 2021.

20        Q.   And do you understand what the document is?

21        A.   Yes.

22        Q.   What is it?

23        A.   This is my Notice of Deposition.

24        Q.   And have you received a Notice of

25   Deposition before?

1    mails.

2         Q.    Did you listen to those voice mails at the

3    time?

4         A.    Shortly after they were left I would have

5    listened to them, yes.

6         Q.    Did you retain those voice mails?

7         A.    Yes.

8         Q.    And have you produced all of the voice

9    mails you retained?

10        A.    Yes.

11        Q.    With respect to the calls from Vivint

12   directly, you said that you believe some of them may

13   have violated the automated or pre-recorded call

14   provisions of the TCPA?

15        A.    Yes.

16        Q.    Is that correct?  What's your basis for

17   contending that those calls were made with an

18   Automated Telephone Dialing System?

19        A.    One of the calls was -- when I say "calls,"

20   I mean a text message.  One of the text messages was

21   sent with generic sort language in it.  It was not

22   personalized in any way.  It transmitted a message.

23   It had a generic link in it that when you clicked it

24   it went to a generic photo, like an advertising

25   photo.  So that I believe with respect to that text

CONFIDENTIAL

1    message.

2            There were other text messages which were

3    also generic.  However, as I specified earlier, they

4    were related to installation.  I think one was about

5    an installer being in the area, or something to that

6    effect.  I think another one was advertising the

7    availability of the Vivint app.  Specifically with

8    respect to the installation, the installation of a

9    Vivint system.

10           And some of -- I don't believe any of the

11   actual calls which were placed by Vivint -- they

12   might have had indicia of automated systems, but they

13   were certainly -- I don't believe had indicia of a

14   VICIdial system.

15       Q.   When you say indicia of VICIdial can you

16   explain to me what that means?

17       A.   Certainly.  VICIdial is a well-known open

18   source dialing system that is based on asterisks.

19   And it's my understanding that there is both Linux

20   distributions with VICIdial with it and you can also

21   just download and install it onto just a generic

22   Linux distribution.  And VICIdial has a specific

23   sound.  I describe it as almost a balloon pop.  It

24   goes like (witness indicating).  Maybe not as high

25   pitched like that.  It's more of like a (witness

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company          www.veritext.com

CONFIDENTIAL

1    indicating).  To me it sounds like a balloon popping.

2    To different people it sounds like different things.

3    Officially that sound is known as the droplet sound.

4    That sound is executed as part of a C macro when the

5    Asterisk MeetMe application is executed.

6        Q.   What is the purpose of that droplet sound?

7        A.   The purpose of the droplet sound, from what

8    I understand, is to allow both the called party, as

9    in the person that's being telemarketed to, and the

10   caller, or the telemarketer, to indicate that the

11   system has detected a human on the other end of the

12   line, and to indicate that a connection has been made

13   between the called party and the caller.

14       Q.   Can VICIdial be configured to change that

15   sound?

16       A.   No. VICI --

17            MR. PARONICH:  Hold on.  I'm just going to

18   object to the extent it calls for speculation with

19   respect to your knowledge of how the VICIdial system

20   works.

21            THE WITNESS:  It's my understanding that

22   VICIdial -- because the droplet sound is executed as

23   part of the C macro, it would essentially involve

24   removing the ability to play that sound, would entail

25   a drastic rewrite of the VICIdial.

Page 37

1      Q.   BY MR. MARIGONI:  Is the C macro that's

2  involved in this process, is it also open source?

3          MR. PARONICH:  Same objection.

4          THE WITNESS:  I believe that the entire

5  VICIdial product is open source.  As to the specifics

6  of the license and what -- as I understand it, some

7  parts of VICIdial are copyrighted and cannot be

8  changed under the terms of its license.  But it's

9  still free and open source software.  I think that

10  the entire concept behind free and open source

11  software is a little muddled to where there are

12  commercial distributions that you can't really change

13  or edit because they're copyrighted, but they still

14  allow you to use them.  So I'm not exactly sure how

15  VICIdial is structured or what the terms of its

16  license agreement are.

17      Q.   That's fair.  Setting aside the legal

18  ramifications of the licensing, you understand -- or

19  do you know whether the source code to that portion

20  of VICIdial is available to users?

21      A.   It might be.

22      Q.   Okay.  For this next part I just want to

23  distinguish -- I know that it's your contention,

24  and we're not going to argue the point that a text

25  message is a call, but I want to focus just on text

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company               www.veritext.com

CONFIDENTIAL

1    messages for this next portion.  Do you contend you

2    received any text messages from DSI?

3         A.   I'm not sure.  One might have been.  Again,

4    I don't know what discovery has uncovered.  I don't

5    believe that the text messages directly said that

6    they were from DSI.  I think that the only things on

7    the text messages were directly from Vivint, and I

8    think the URL on the text message was a Vivint URL.

9         Q.   So with respect to the text messages you

10   received from Vivint, what phone number are those

11   received on?

12   ███  ████████████████

13        Q.   Is that a cell phone?

14        A.   No.

15        Q.   How do you receive text messages on that

16   number?

17        A.   So that telephone number is through a

18   company called Anveo, and Anveo provides a webhook

19   functionality that you can send text messages to the

20   number and it will then parse the text message and

21   send it out to a web server that I have then

22   configured to take what Anveo is sent and just email

23   me the contents.

24        Q.   So what device did you receive these text

25   messages on?

CONFIDENTIAL

```
 1          A.   I didn't receive them on a device.  They
 2     were sent to my telephone number.  The message gets
 3     sent to a webhook that then sends me an email.
 4          Q.   Okay.  So each time a text message was sent
 5     ████████████████████████████████████████████████████
 6     that you have configured into an email that you
 7     received?
 8          A.   Yes.
 9          Q.   And it was not delivered to a phone?
10          A.   It was delivered to the phone number.
11          Q.   Did it -- was it displayed on any phone
12     when it was received?
13          A.   No.
14          Q.   Did it cause any phone to ring?
15          A.   When the email -- when that message went
16     through my email, it probably dinged my email and
17     dinged my phone, if it was on silent at the time.  I
18     don't recall whether or not it was or wasn't.
19          Q.   Which phone would it have dinged?
20          A.   My email was on my cell phone.  So it would
21     have dinged my cell phone.
22          Q.   What's the number for that phone?
23     ███    ███████████████
24          Q.   You had previously talked about calls, and
25     here I am talking about calls more broadly, including
```

Page 40

1  text messages you received in the summer of 2019.

2  Did you receive calls or text messages directly from

3  Vivint after the summer of 2019?

4      A.   I believe the last Vivint-related text

5  message, if we want to use that term, was made some

6  time in July or August of 2019.

7      Q.   What was the content of that text message?

8      A.   That was a message that was advertising

9  Vivint's products and services.  I think it said

10  something about switching to Vivint, and it had a

11  link to Vivint, and it also had a link -- when you

12  clicked that link it was a photo.  It was like an

13  advertising photo of various Vivint -- I guess,

14  things that Vivint offers.

15      Q.   Did you incur any charges as a result of

16  calls you received directly from Vivint?

17      A.   Both -- I've incurred charges both for the

18  calls and for the text messages.

19      Q.   And is that -- with respect to the

20  telephone calls is that a per call or -- well, is it

21  a per-call charge?

22      A.   There is a per-call charge, and there is

23  also a permanent charge.

24      Q.   With respect to text messages, is that a

25  per-message charge?

CONFIDENTIAL

1    A.    It's charged on the basis of how many

2    160-character blocks you receive.

3    Q.    Is that rounded up or down, do you know?

4    A.    I believe it's rounded up.

5    Q.    And did you respond to any text message

6    from Vivint asking that Vivint stop texting you?

7    A.    So as I recall there were two blocks of

8    text messages.  The first blocks were I think mostly

9    related to the installation or installation-related

10   text messages.  Those text messages were sent after I

11   had communications with Vivint's outside compliance

12   counsel, Michelle Shuster of Mac Murray and Shuster,

13   with respect to the illegal calls that I'd received.

14        With respect to the July or August text

15   messages, the last one that I received that we just

16   discussed, that was sent to me after this lawsuit was

17   filed, and after I had received that text message I

18   believe I texted "stop" and I also texted to the

19   carrier.  I believe it was -- I don't know it it's a

20   carrier or provider, to qualify that the text

21   messages were spam and should be reported.

22   Q.    Did you produce the messages that you sent

23   with respect to those qualifier text messages?

24   A.    Yes.

25   Q.    Let me ask you now a little bit about the

Page 42

CONFIDENTIAL

1    class claims, or the classes that you seek to

2    represent.

3              Can you explain to me what the classes that

4    you're seeking to certify in this case are?

5         A.   Certainly.  There are three classes.  The

6    first class is a national Do Not Call Registry class.

7    That class seeks to represent a group of persons who

8    received calls or text messages from Vivint or DSI,

9    or any of its third parties acting on its behalf, to

10   their numbers which are on the national Do Not Call

11   Registry.

12             The second is an internal do-not-call

13   procedures class.  That class seeks to represent a

14   group of persons who -- to whom Vivint, DSI, or any

15   third party acting on its behalf, sent any text

16   messages without the existence of proper policies and

17   procedures as codified in 64 CFR -- I'm sorry, 47 CFR

18   Section 64.1200 specifically relating to do-not-call

19   policies, procedures, training and what have you.

20             The third class is a class of robocall

21   class of persons who have received calls or text

22   messages sent using an artificial or pre-recorded

23   voice or an automatic telephone dialing system to

24   their cell phone numbers or numbers for which the

25   called party is charged for the call.

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company                  www.veritext.com

CONFIDENTIAL

1    Q.   With respect to the national DNC class, and

2    you understand which class I am referring to when you

3    say the "national DNC class"?

4    A.   Yes.

5    Q.   Do you understand there is a -- well, let

6    me phrase this another way.  Is there any content

7    requirement for calls to violate that provision and

8    thus bring them within the class?

9    A.   Yes.  I understand that they need to be

10   made for telemarketing purposes.

11   Q.   Are there any other requirements or

12   limitations as to the types of numbers called?

13   A.   That they need to be on the Do Not Call

14   Registry for, I believe, at least 30 days prior to

15   the receipt of the calls.

16   Q.   Anything else?

17   A.   I also believe that they need to have more

18   than one call on -- I'm not sure exactly how the

19   legal works, but I believe it's more than one call

20   within the past 12 months.

21   Q.   Okay.  Do those same requirements apply to

22   the internal procedures class members?

23   A.   I believe they do, except for the

24   requirement that they be on the Do Not Call Registry.

25   Q.   And I apologize if I've asked you this, but

1    do you contend any of the calls, and this is with

2    respect to what you deem the robocall class, do you

3    contend any of the calls in this case involved

4    pre-recorded messages?

5         A.   I'm not sure as to the legal status of how

6    a text message that's been pre-programmed would

7    qualify as pre-recorded.  So if a text message is

8    programmed in a sense and sent out to a bunch of

9    people, I think that might be pre-recorded, but I

10   haven't -- with respect to the summer 2019 calls, no

11   pre-records; with respect to the December, winter

12   2020 calls, just made by DSI for DIRECTV those calls

13   were made with pre-recorded messages.

14        Q.   Okay.  Do you contend any calls were made

15   with an artificial voice?

16        A.   If memory serves, potentially one of the

17   installation messages that was left on my phone for

18   the installation was from an artificial voice.

19        Q.   Do you know -- well, do you know what day

20   that call was received?

21        A.   It might have been in the first or second

22   week of June of 2019.

23             MR. MARIGONI:  Okay.  I'm going to bring up

24   what we would like to have marked as Exhibit No. 2.

25             (EXHIBIT 2 MARKED.)

CitiCourt, the Reporting Group                    801-532-3441
A Veritext Company                        www.veritext.com

CONFIDENTIAL

1          Q.   BY MR. MARIGONI:  I've pasted that in the

2    chat.

3               Mr. Perrong, if you would let me know if

4    and when you're able to receive that.  And, Marsha,

5    if you could mark that as Exhibit 2 for us.

6               Anthony, I guess I should confirm you

7    received the exhibit as well?

8               MR. PARONICH:  My bad.  I can and have.

9               MR. MARIGONI:  Perfect.  Thank you.

10          Q.   Have you been able to access that exhibit,

11   Mr. Perrong?

12          A.   I'm sorry.  Could you please repeat

13   yourself?

14          Q.   Have you been able to access the Exhibit 2?

15          A.   Yes.

16          Q.   Have you seen this document before?

17          A.   Yes.

18          Q.   When was the first time you saw it?

19          A.   Shortly before August of 2019.

20          Q.   Who drafted this complaint?

21          A.   Unless drafted -- I'm not sure that I can

22   answer the question without revealing confidential

23   conversations I've had with my attorney.

24               MR. PARONICH:  Was the question "who

25   drafted"?

1           MR. MARIGONI:  Yes.

2           MR. PARONICH:  I don't have an objection to

3    the identification of an individual or individuals.

4           THE WITNESS:  I drafted the complaint along

5    with my attorneys.  I had input into the drafting,

6    but the core of the document was drafted by my

7    attorneys.

8       Q.   BY MR. MARIGONI:  Why did you decide to

9    retain counsel in this case?

10      A.   I spoke with counsel, and based on the

11   discussions we had we felt that it was appropriate

12   that I retain them, and that I retain counsel in this

13   matter.

14      Q.   Why did you decide to bring the case as a

15   class action?

16      A.   I know I'm not the only one that received

17   the calls.  Turns out that that assumption of mine

18   was correct.  And I know that, you know, if I'm

19   getting calls, especially after I had previously had

20   a dispute with Vivint that I resolved, and I still

21   continue to get calls made by or on behalf of Vivint,

22   that other persons -- potentially other persons who

23   have previously gotten calls, potentially other

24   persons who are just sitting at home every day

25   minding their own business, are getting these

Page 47

CONFIDENTIAL

```
 1          A.    No.

 2          Q.    Did you receive a response to that message?

 3          A.    Yes.

 4          Q.    And where were these messages delivered?

 5          A.    They would have been delivered to the

 6   797979 short code.

 7          Q.    And the messages that came to you, where

 8   were they delivered?

 9          A.    They were sent to my telephone number

10   ██████████████

11          Q.    And then did you receive those in your

12   email?

13          A.    Yes.

14          Q.    Look at paragraph 68.  You allege that the

15   797979 short code is for CallFire.  How do you know

16   this?

17          A.    I believe that that was -- you can query

18   the CTIA or CITA database, and find out what company

19   or group of companies, resellers, are assigned a

20   particular short code.

21          Q.    Did you ever receive a text message through

22   or from CallFire before?

23          A.    Not to my knowledge.

24          Q.    Other than responding to the text message,

25   did you try to contact CallFire about these calls?
```

```
1        A.    No.
2        Q.    Do you contend that CallFire has any
3    liability for the delivery of these text messages to
4    your phone number?
5              MR. PARONICH:   Objection, you can answer.
6              THE WITNESS:   Depending on whether or not
7    they are -- I don't know their corporate or
8    regulatory structure with respect to the FCC.  It's
9    my understanding that carriers can be liable for
10   calls that they helped make or made to violate the
11   TCPA.
12       Q.    BY MR. MARIGONI:   Have you sued CallFire
13   for these text messages?
14       A.    No.
15       Q.    Do you intend to amend the complaint to add
16   CallFire at this time?
17       A.    If we do that's a discussion that I can
18   have with my attorneys, and we'll discuss it.
19       Q.    Other than the calls that we just walked
20   through that are identified in the Second Amended
21   Complaint, are there any other calls which you're
22   seeking recovery for from Vivint in this lawsuit?
23       A.    No.
24       Q.    And do you have records or recordings of
25   any other calls you received from Vivint?
```

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company                www.veritext.com

CONFIDENTIAL

1        A.    I might still have the recordings of the

2   calls that we settled on prior to the 2019 calls.  So

3   the 2018 calls I might still have recordings of

4   those.  Of course, the recordings of these calls that

5   we've produced, and I don't believe there is any

6   other recordings.

7        Q.    Did you search for or confirm whether you

8   have the calls from the prior settlement with Vivint?

9        A.    I likely did.  I'm not sure whether or not

10  they were produced.  I'm pretty sure they weren't.

11  So -- yeah.

12       Q.    Okay.  What software or devices do you use

13  to record calls?

14       A.    It depends on where the call is originated.

15

16

17

18

19

20

21

22

23

24

25       Q.    Is that recording automated, or do you have

Page 85

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 86

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 87

CONFIDENTIAL



Page 88

CONFIDENTIAL

1    this business?

2         A.   So structure-wise, the Pennsylvania

3    Telephone Company was a DBA of John's LLC, which is

4    Jawk Enterprises, LLC.  J-a-w-k, Enterprises, LLC.  I

5    was a 1099 subcontractor for Jawk.

6         Q.   Was that -- I mean, maybe the distinction

7    doesn't matter.  Was your 1099 made out to you

8    personally or to Andy Media?

9         A.   I believe it was made out to me personally.

10   Because Andy Media, it's just a sole proprietor, so

11   it's not even an LLC or anything like that.  For all

12   intents and purposes it's the same entity.  So it

13   probably was made out to me.

14        Q.   You stated that The Pennsylvania Tel Co was

15   a DBA of John's LLC.  Did you have any ownership

16   interest in that entity?

17        A.   No.

18        Q.   What was your role in that company?

19        A.   I was a 1099 subcontractor.  I handled most

20   of the technical aspects of setting up the systems

21   and things like that.  John was more the business

22   aspect.  I mean, he handled the technical aspects as

23   well, but I was more the technical side, he was more

24   the business side.

25        Q.   Did you host the PBX for that business?

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company          www.veritext.com

CONFIDENTIAL



Page 90

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 91

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 92

CONFIDENTIAL



Page 93

CONFIDENTIAL



Page 94

CONFIDENTIAL

```
 1    family, they're going to be in the phone book so they
 2    are not going to be recorded.  But, for example, it
 3    can be useful to have, say, somebody that calls me up
 4    about an appointment, doctor's appointment or
 5    something like that.  I'll tell them that the call is
 6    recorded, of course, but it would be useful because
 7    that way I don't have to take notes.  I don't have to
 8    write anything down.  If they tell me something, I
 9    can just refer back to the recording if I forget a
10    telephone number or if I forget, you know, an account
11    number or something that they give me.
12         Q.   So really your purpose is to just capture
13    the content of the call so you can refer to it later?
14         A.   Yes.
15         Q.   You mentioned -- and you said of course you
16    tell them you're recording.  Do you tell everyone who
17    calls that you're recording them?
18         A.   Try to, as quickly as I can get it out
19    during the call.
20         Q.   I am guessing, I probably know the answer
21    to this next question, then.  Are you aware that
22    Pennsylvania's Wiretap Act requires all party consent
23    to the recording of the call?
24         A.   Yes.
25         Q.   Did you tell any of the callers who called
```

CitiCourt, the Reporting Group                    801-532-3441
A Veritext Company                          www.veritext.com

CONFIDENTIAL

```
 1    you -- I am going to say the word "call" a lot.  Let
 2    me try to -- for any of the calls that are the
 3    subject of your complaint, any of the calls we
 4    discussed today, did you tell those callers you were
 5    recording them?
 6         A.   I believe I did.
 7         Q.   If you did not, do you believe you were
 8    required to?
 9              MR. PARONICH:  I'm sorry, Andrew, I thought
10    I was on mute.  I'm going to object on form, but you
11    can answer that.
12              THE WITNESS:  I know there are certain
13    exceptions to the Pennsylvania Wiretap law with
14    respect to equipment that connects to the telephone
15    ████████████████████████████████████████████
16    ███████████████████████████████████████████
17    █████████████████████████████████████████
18        ███████████████████████████████████
19    ██████████████████████████████████████████████
20    ███████████████████████████████████████████
21    ██████████████████████████████████████████████
22    ██████████████████████████████████████████████
23    ███████████████████████████
24         Q.   Do you think any other exceptions on the
25    Wiretap Act apply?
```

Page 96

CONFIDENTIAL

1      A.    I'm not a lawyer, and I don't really know

2   all the exceptions or what would be applicable or

3   what would not.

4      Q.    And at the time you received -- going back

5   to our colloquial term, the summer of 2019 calls,

6   calls between April 4th and September 5th, 2019,



Page 97

CONFIDENTIAL

```
 1    my inbox, even if I said, I don't know anything about
 2    this, or This doesn't interest me, delete it.  That's
 3    not something I wanted to do, so I left the LISTSERV.
 4         Q.    What email address were you subscribed
 5    with?
 6    ██████   ████████████████████████████████████
 7    ████████████████████████████
 8         Q.    Let's talk about your experience as a class
 9    representative.
10              MR. PARONICH:  Is this a good place --
11    because we have been going about 90.  Is this a good
12    place or do you want to get through this line here?
13              MR. MARIGONI:  Sure.  Let's go ahead and
14    take a break.
15              MR. PARONICH:  Let's call it 3-, slash,
16    1:45.
17              MR. MARIGONI:  Yes, that will work.
18              THE VIDEOGRAPHER:  Going off the record.
19    The time is approximately 1:33 p.m.
20              (Recess.)
21              THE VIDEOGRAPHER:  Returning on the record.
22    1:47 is the time.
23              Counsel.
24         Q.    BY MR. MARIGONI:  Thank you.  Mr. Perrong,
25    I am going to ask a little bit about your experience
```

Page 145

CONFIDENTIAL

1   as a class representative.  I want to distinguish

2   between two things just to make sure we are on the

3   same page and talking about this.

4           The first is, you know, you being named as

5   a class rep, so I'll try to use that terminology.

6   That is that your name is put on a complaint and as

7   proposed representative of a punitive class.  Then

8   we'll have some questions about whether you've been

9   appointed a class rep.  There I intend to refer to a

10  circumstance where a court has approved a class

11  certification, whether contested or settled, and

12  appointed you as a class rep.

13          Does that distinction make sense between

14  being named and being appointed?

15      A.   Yes.

16      Q.   Thank you.  So I'm sure I know the answer

17  to this question.  Have you ever been named as a

18  class representative in a TCPA class prior to this

19  case?

20      A.   Yes.

21      Q.   Have you ever been appointed a class

22  representative in a TCPA class?

23      A.   I have one case that resulted in a class

24  settlement in which I am currently seeking to be the

25  named representative in the settlement.

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company                www.veritext.com

CONFIDENTIAL

1        Q.   And so what case is that?

2        A.   Perrong versus Frontier Utilities

3   Northeast.

4        Q.   And so just to break that down a little

5   bit, and to make sure I understand that, are you

6   saying you've reached a settlement of the class

7   claims in that case?

8        A.   That is correct.

9        Q.   So you and the defendant in that case are

10  jointly asking that a class be certified, correct?

11  For purposes of settlement?

12       A.   It's my understanding that the defendant is

13  taking the position that there is no agreement, even

14  though we're taking the position that there is an

15  agreement.

16       Q.   Okay.

17       A.   They're contesting it, but we filed with

18  the court a motion to approve the class settlement.

19       Q.   Okay.  Fair enough.  So a somewhat

20  unorthodox class settlement, it sounds like.

21            Other than that case, is there any case in

22  which you have -- or your lawyers have on your behalf

23  filed a motion to certify a class and to appoint you

24  as the class rep?

25       A.   No.

1          Q.    What about in a non-TCPA case?

2          A.    No.

3          Q.    These next questions should probably be

4    very straightforward, then.

5                Has a court ever held that you could not

6    serve as a class representative in a class action?

7          A.    No.

8          Q.    And has a court ever held that you could

9    serve as a class representative in a class action?

10         A.    That determination is pending, I suppose,

11   in the current case, but other than that there's been

12   no determination.

13         Q.    And no determination has yet been made in

14   that case, correct?

15         A.    That's correct.

16         Q.    Do you know if pursuing this class as a

17   class action changes the relief that's available to

18   you?

19         A.    Yes.

20         Q.    How so?

21         A.    Essentially my relief would be whatever the

22   class gets.  So as a member of the class I am

23   entitled to whatever relief the class obtains, in

24   addition to possibly an incentive award.

25         Q.    Do you think that is less than what you

CONFIDENTIAL

1  would receive if you pursued this case individually?

2      A.   Yes.

3      Q.   How much less do you think it is?

4      A.   I'm not sure.  It depends on how much the

5  incentive award is and how much -- if this case were

6  to proceed to a jury trial, individually I would get

7  substantially more some cases.

8      Q.   Do you have an estimate of what you would

9  receive if you had just pursued this case

10 individually to a successful jury trial?

11     A.   Depending on how many violative calls are

12 found to violate the TCPA, assuming 20 calls,

13 potentially $60,000.

14     Q.   But you believe you'll receive less than

15 that if resolved as a class action, correct?

16     A.   Generally it's my understanding that

17 incentive awards are anywhere in the range of a few

18 thousand dollars to maybe 20- or 25,000 at most, I

19 think.  I haven't looked at every single case in

20 which an incentive award has been made.

21     Q.   You testified earlier that you do intend to

22 seek an incentive award?

23     A.   I intend to speak with my attorneys and

24 determine whether or not an incentive award would be

25 appropriate.

Page 149

1      Q.    Will you receive any part of any attorney

2   fees that might be awarded?

3      A.    No.

4      Q.    Have you received any compensation with

5   respect to this case in your role as a plaintiff?

6      A.    No.

7      Q.    Do you understand that if you were to lose

8   this case, so if this case were to be decided against

9   you, you would be liable for the defendant's costs?

10      A.    It's my understanding that legally speaking

11   I would be -- we are in the American system, so

12   generally the loser does not pay.  So with respect to

13   costs as a prevailing party under the Federal Rules

14   of Civil Procedure, it's my understanding that any

15   court costs, as that term is defined, would be --

16   should the defendants prevail, would be payable to

17   the defendants.

18      Q.    Payable by you and your co-plaintiffs,

19   correct?

20      A.    I'm not sure exactly as to the specifics of

21   that with respect to my client fee agreement with my

22   attorneys.

23      Q.    And certainly I suppose you could agree

24   with whatever you want with your attorneys, but a

25   cost award would be entered against you as the party;

Page 150

CONFIDENTIAL

1    is that correct?

2         A.   That's correct.

3         Q.   How much time do you anticipate dedicating

4    to this case as a class representative, let's say, on

5    a weekly basis?

6         A.   A few hours a week depending on what

7    discovery is propounded and what turn the procedural

8    posture of the case makes.   Potentially a class

9    certification motion, or a summary judgment motion

10   would obviously incur more time than just a week in

11   which nothing progresses in the case at all.

12        Q.   How many hours a week are you expected to

13   be working for your summer internship?

14        A.   I believe it's just a four -- it's a full

15   workweek, I believe, so it's the normal 40 hours or

16   whatever a typical workweek is at the AG's office.

17        Q.   And are you continuing to work for -- do

18   you work with Andy Media during the summer?

19        A.   To an extent, yes.

20        Q.   Do you do work for Andy Media during the

21   school year?

22        A.   Yes.

23        Q.   About how many hours a week?

24        A.   Again, like I said, it's been really slow

25   with the pandemic, and I have been trying to sort of

Page 151

CONFIDENTIAL

1   ████████████████████████████████████

2   ████████████████████████████████████

3   ███████████████████████████████████████

4   ██████████████████████████████████████

5   ██████████████████████

6        Q.    How many currently pending or open class

7   action matters are you a party to?

8        A.    I'd say about five.

9        Q.    And how many individual non-class action

10  matters?

11       A.    I believe two.

12       Q.    Do you anticipate your time commitment for

13  the other class actions will be similar to that for

14  this case?

15       A.    Potentially, but I think those cases are

16  staggered and are in various phases.  One was just

17  filed.  One we're -- I don't want to discuss anything

18  with attorneys, but one was just filed, and one is

19  further along.  So they're at various stages

20  and staggered, and depending on the procedural

21  posture, some cases might be more time, some might be

22  less time.

23       Q.    Do you think any of those cases will

24  proceed to a trial in the next two years?

25       A.    It's possible.

CONFIDENTIAL

```
 1          Q.   So between law school, Andy Media, five
 2    class actions, and your individual actions, do you
 3    have -- is your ability to serve as a class rep going
 4    to be impacted by your other time commitments?
 5          A.   No.
 6          Q.   Why is that?
 7          A.   Because I can structure my time very well.
 8    I think that I have a track record of that having
 9    pursued two degrees, including an advanced degree in
10    undergraduate, while running Andy Media more than
11    what I am now.  And also simultaneously running some
12    TCPA litigation, including class action litigation.
13    It's been demonstrated that I have that ability.
14          Q.   How many class actions were you running
15    concurrently while pursuing your Ph.D.?
16          A.   Three or four.
17          Q.   But none of those cases proceeded past
18    class certification?
19          A.   I mean, some are still pending.  One is
20    bifurcated in discovery.
21          Q.   Will you be available to testify in this
22    case if this case proceeds to trial?
23          A.   Yes.
24          Q.   If this case is set for trial during
25    your -- I guess it's your third and fourth year of
```

Page 153

CONFIDENTIAL

```
 1        Q.    For your two prior depositions, were you
 2   represented by Mr. Paronich in those cases?
 3        A.    Yes.
 4        Q.    Did he attend those depositions personally?
 5   In person?
 6        A.    Yes.
 7        Q.    Who are your other attorneys in this
 8   matter?
 9        A.    Mr. Murphy and Mr. Pearson.
10        Q.    And how did you come to retain Mr. Murphy?
11             MR. PARONICH:  I'll object, just -- hold
12   on.  Sorry, Andrew.  Just with an instruction not to
13   answer with respect to any communications we have
14   had.  I guess I'll object to form as well as it seems
15   a little vague.  You should still answer.
16             THE WITNESS:  I spoke with Mr. Paronich,
17   and that was part of our discussions as to who else
18   would be on the case.
19        Q.    BY MR. MARIGONI:  Is it fair to say you did
20   not hire Mr. Murray independently of Mr. Paronich?
21             MR. PARONICH:  I'm going to object again,
22   but you can answer.  My objection on that is form.
23             THE WITNESS:  It was a mutual decision that
24   we all agreed to.
25        Q.    BY MR. MARIGONI:  What is Mr. Murphy's --
```

Page 156

1     there's probably nothing interesting you can tell me

2     that's not privileged, so I think I'll just move on.

3           When did you first meet with an attorney

4     regarding this lawsuit?

5        A.   Sometime in June, or maybe late June or

6     early July of 2019.

7        Q.   Did you meet with any other attorneys aside

8     from Mr. Murphy, Mr. Paronich, and Mr. Pearson?

9        A.   I don't believe so.

10       Q.   How did you first become interested in the

11    TCPA?

12       A.   I don't think that I have ever really been

13    interested in the TCPA.  Maybe I just don't

14    understand what you mean by "interest."

15       Q.   When did you learn about the TCPA?

16       A.   Probably sometime in 2003 or 2004.

17       Q.   How old were you in 2004?

18       A.   8 years old probably.

19       Q.   Precocious.  At what point did you first

20    determine that some right of yours was being violated

21    by a telephone call?

22       A.   I mean, probably sometime around the time

23    that I -- I mean, I knew about the TCPA.  I knew

24    about TCPA lawsuits around 2003, 2004 just because I

25    had read about it.  I hadn't really pursued anything

Page 157

1    about it.  I put it in the back of my mind.

2          With respect to actually knowing the

3    process and actually taking steps to seek my rights

4    under the TCPA, that would have been sometime in

5    2015.

6          Q.   Is that -- well, when did you send your

7    first demand letter to a company regarding the TCPA?

8          A.   Sometime in late 2015, early 2016.

9          Q.   When did you file your first lawsuit under

10   the TCPA?

11         A.   Same time frame, I think.  Late 2015, early

12   2016.

13         Q.   Was that filed pro se?

14         A.   Yes.

15         Q.   When is the first time you retained an

16   attorney to file a lawsuit on your behalf under the

17   TCPA?

18         A.   2018, I think.

19         Q.   How many cases would you say you've filed

20   under the TCPA pro se?

21         A.   I never counted specifically.  Maybe 40 or

22   50.

23         Q.   And what percentage, if you can estimate,

24   of complaints you've made to companies are resolved

25   before you file suit?

CONFIDENTIAL

```
 1        A.    No clue.  I have never counted or done that
 2   calculation.
 3        Q.    Do you know how many total demands you sent
 4   to companies regarding TCPA?
 5        A.    No.
 6        Q.    Do you have any sort of -- do you track in
 7   a spreadsheet demands or cases that you filed?
 8        A.    No.
 9        Q.    Do you have any document that you track
10   those in?
11        A.    No.
12        Q.    Have you ever filed a TCPA case in small
13   claims court?
14        A.    I filed TCPA cases in Magisterial District
15   Court.
16        Q.    Is that a limited jurisdiction court with a
17   maximum dollar amount?
18        A.    Yes.  They're courts of limited
19   jurisdiction.
20        Q.    Have you ever filed an arbitration
21   asserting claims under the TCPA?
22        A.    No.
23        Q.    Have you ever testified at a trial?
24        A.    I've testified at hearings, never a trial.
25   Other than a -- let me correct myself.  Other than at
```

Page 159

CONFIDENTIAL

1    a Magisterial District Court trial, to the extent
2    that that is considered a trial.
3          Q.   How many times have you testified at
4    Magisterial District Court trial?
5          A.   Once.
6          Q.   And what types of hearings have you
7    testified at?
8          A.   I've testified at default hearings, status
9    conferences, motions conferences.  I believe one was
10   a motion to dismiss.
11         Q.   And approximately how many hearings have
12   you appeared and given testimony at?
13         A.   More than five, probably less than ten.
14         Q.   How many total TCPA complaints have you
15   filed?
16         A.   I have never counted.
17         Q.   Do you think it's more than 100?
18         A.   I think that's close to around what it is.
19         Q.   So more than 200?
20         A.   Probably not.
21         Q.   But more than 50?
22         A.   Probably.
23         Q.   You said you currently have five active or
24   open class actions.  And how many non-class action
25   TCPA classes?

Page 160

CONFIDENTIAL

```
 1          A.   I know for a fact that I have two open
 2   non-TCPA -- I'm sorry.  Two pro se open TCPA cases.
 3   I know that.
 4          With respect to class cases, I think it's
 5   about five.  I haven't counted.  I need to sit down
 6   and look at every one.  Somewhere around five.
 7          Q.   So how do you track your active litigation,
 8   and, as you put it earlier, manage your time with
 9   respect to this litigation?
10          A.   I don't.  If I have a hearing or something
11   I'll put it in the calendar -- in my calendar.
12          Q.   Do you have a Pacer account?
13          A.   Yes.
14          Q.   Do you monitor or -- let me ask that a
15   different way.
16          Do you look up your active cases to review
17   their status and their filings.
18          A.   Not on Pacer.
19          Q.   How do you do it?
20          A.   The court will send me an email with a
21   link.
22          Q.   So do you have an ECF account, then?
23          A.   I think it's a combined ECF Pacer account,
24   but in the Eastern District, at least, for my cases,
25   the Eastern District Clerk's Office sends an email
```

Page 161

CONFIDENTIAL

1    every time something gets filed on the case.

2         Q.   Are you on the ECF service list for your

3    cases?

4         A.   I guess that might be through the ECF

5    service list.  I am not sure.  I have never really

6    looked into the technical operation of how the U.S.

7    court systems sends out emails.

8         Q.   Do you receive emails when there are

9    filings made in this case?

10        A.   No, I don't.  Other than what my attorney

11   sent me.

12        Q.   But does the court send you an email?

13        A.   No.

14        Q.   So how do you track the hearings deadlines,

15   et cetera, in this case?

16        A.   I trust the attorneys that I've retained to

17   keep me apprised of any pertinent information and

18   commitments in accord with their ethical obligations.

19        Q.   Have you ever been sued before as a

20   defendant in litigation?

21        A.   I have had counterclaims asserted against

22   me, and I believe that I was named as a necessary

23   party in an insurance indemnification case.

24        Q.   So let's break that down a little bit.

25             Have you ever been sued as a defendant,

Page 162

CONFIDENTIAL

```
 1   just individually, not in the context of a
 2   counterclaim or a suit you had filed?
 3        A.   No.
 4        Q.   But you have been named as a counterclaim
 5   defendant when you have filed suit, correct?
 6        A.   Yes.
 7        Q.   How many times would you say?
 8        A.   Once, I believe.  Maybe twice, but I think
 9   only once.
10        Q.   What case was that in?
11        A.   That was Perrong versus Golden Rule
12   Insurance Company.
13        Q.   What was the counterclaim asserted against
14   you?
15        A.   There were two.  One was fraud, the other
16   was abusive process.
17        Q.   And have those claims been resolved?
18        A.   Yes.
19        Q.   How were they resolved?
20        A.   They were resolved through an individual
21   resolution while a motion to dismiss was pending.
22        Q.   So is that to say the broader case was
23   settled?
24        A.   The broader case was settled during the
25   pendency of our motion to dismiss their
```

Page 163

CONFIDENTIAL

1    counterclaims.

2         Q.   You said you believe that's the only one?

3         A.   That's the only one.  I believe in one it

4    was threatened, but not actually filed.  That's the

5    one that I am thinking of.

6         Q.   Was that case also settled?

7         A.   Yes, that case was settled.

8         Q.   Do you know if it was -- I guess it doesn't

9    matter.  It was certainly settled before any

10   counterclaim was filed, correct?

11        A.   Yes.

12        Q.   Tell me about this insurance

13   indemnification case.  What was that case about?

14        A.   This was in connection with the TCPA matter

15   that I believe one of the telemarketers was seeking

16   indemnification from an insurance company.  As the

17   named plaintiff in that lawsuit, the insurance

18   company named me as a necessary and indispensable

19   party in their litigation I guess with the energy --

20   or with telemarketer.

21        Q.   Just to make sure I understand.  So you had

22   sued the telemarketer; is that right?

23        A.   That's correct.

24        Q.   And how was that case resolved?

25        A.   That case is still pending.

Page 164

1    Q.    That case is still pending.  Okay.  Then

2  the telemarketer in a separate action filed against

3  their insurance company for coverage?

4    A.    I believe either they filed for coverage --

5  or I think maybe the insurance company filed a

6  declaratory judgment action seeking a declaration

7  from the court that the coverage was excluded.

8    Q.    One of the two parties sought a coverage

9  determination?

10    A.    Yes.

11    Q.    And then they brought you in essentially, I

12  suppose, to establish the nature of the claims or

13  liability or something like that?

14    A.    I assume so.

15    Q.    I'm not sure why they brought you in

16  matters that much as much as that you were named.

17        Were they successful in having you brought

18  in as a necessary party?

19    A.    I believe that we agreed informally with

20  the insurance company to provide any information that

21  they had requested, and they subsequently dismissed

22  me without prejudice.  I believe it was without

23  prejudice.

24    Q.    So you are not currently a party to that?

25    A.    That's correct.

Page 165

CONFIDENTIAL

1        Q.    Have you ever visited any of Vivint's
2   social media pages or sites?
3        A.    Not to my knowledge.
4        Q.    And do you know anyone who works for
5   Vivint?
6        A.    Other than the persons with whom I
7   interacted during the calls, and, of course, the
8   person -- he might have been a contractor for Vivint.
9   I'm not sure exactly what the one in 2018 was, but
10  other than those people, just knowing them from my
11  interaction with them, I don't personally know any.
12       Q.    Let's go through and talk about the phone
13  numbers at issue in this case.  Why don't you tell
14  me, again, what phone numbers you are asserting
15  claims for based on in this case.
16  ██  ████████████████████████████
17  ████████████████████████████████
18  ███████████████████████████████████
19  █████████████████
20  ██  █████████████████████████████
21  ██  █████████████████████████████
22  ██
23  ██  ███████████████████████
24  ██  █████████████████
25  ██  █████████████████████████████

                                    Page 171

CONFIDENTIAL

```
 1   that time?
 2        A.   No.
 3        Q.   Whose name was it in at that time?
 4        A.   I don't know.  I assume it was under my
 5   parents' name.
 6        Q.   Do you know if it was both of them or just
 7   one of them?
 8        A.   I don't know.
 9        Q.   Who was the carrier at that time?
10        A.   That would have been Verizon.
11        Q.   Was that a residential or cell number?
12        A.   Residential.
13   ████  ████████████████████████████████████
14        A.   I believe it's under my mother's name and
15   my name.
16        Q.   When was it put in your name and your
17   mother's name?
18        A.   Sometime in January -- either late 2018 or
19   early 2019.  So either December of 2018 into January
20   of 2019.
21        Q.   What was the purpose of that change?
22        A.   Well, we moved houses, so we moved the
23   number.
24        Q.   Did you change carriers at that time?
25        A.   Yes.
```

Page 172

CONFIDENTIAL

1    Q.   And is that the first time you changed

2    carriers since 2001, 2002?

3    A.   Yes.

4    Q.   And who did you change carrier to?

5    A.   Anveo.

6    Q.   I know we talked a little about what Anveo

7    is, but maybe just more generally, what is Anveo?

8    A.   Anveo is a telephone company.

9    Q.   And what kind of services do they provide?

10   A.   They provide primarily voice over IP

11   telephone service.

12   Q.   And how did you hear of Anveo?

13   A.   Might have been through -- might have

14   either been through a magazine or some online

15   website, technical website of some sort.

16   Q.   And why did you choose to switch to Anveo?

17   A.   I'm not really sure what you -- why I would

18   switch -- because I moved houses.

19   Q.   Could you have kept the Verizon plan?

20   A.   Well, if I am moving my house, and I want

21   phone service at the old house, but I don't want

22   Verizon to provide me other services, because this

23   was part of a bundle, I don't know why I would go

24   with Verizon over Anveo.

25   Q.   So is there anything in particular about

Page 173

CONFIDENTIAL

1    what Anveo provides that you preferred to Verizon?

2         A.   They provide an excellent voice over IP

3    service at an attractive price.

4         Q.   What Anveo plan are you signed up for on

5    ███████████████████

6         A.   It's a -- there's a fee for the number per

7    month.  There's then a fee per minute for permanent

8    charges and per text message charges, and then

9    there's also a charge for the provision of caller ID

10   name.

11        Q.   Prior to switching to Anveo, have you ever

12   ████████████████████████████████████████

13        A.   I believe I had.

14        Q.   Have you ever had a TCPA action dismissed

15   ██████████████████████████████████████████

16   or a phone on which you paid for the call?

17        A.   No.

18        Q.   Is the fact that Anveo charges per minute

19   part of why you chose that service?

20        A.   It's cheaper than other competing services,

21   and that's Anveo's -- and, frankly, most voice over

22   IP provider's method of charging for calls is

23   permanent.

24        Q.   Does Anveo offer different kind of broad

25   plans?

CONFIDENTIAL

1       A.   I believe for their -- for some of their

2   offerings they do.

3       Q.   Is that your complete answer?

4       A.   Yes, I believe they offer various plans for

5   various offerings.

6       Q.   I didn't want to cut you off.  Sounded like

7   you might have more to say.

8            Is the plan that you're using Anveo Direct?

9       A.   Yes.

10      Q.   Why did you choose Anveo Direct over Anveo

11  for consumers or Anveo for business?

12  ████ ████████████████████████████████████

13  ████████████████████████████████████████

14  █████████████████████████████████████████

15  ███████████████████████████████████

16  ██████████████████████████████████████

17  ████████████████████████████████████████

18  ███████████████████████████

19  ████ ████████████████████████████████████

20  ████████

21  ████ ██████████████████████████████████████

22  █████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████

25      Q.   And are you aware that Anveo markets Anveo

                                    Page 175

CONFIDENTIAL

1    Direct as a wholesale service?

2         A.   I'm aware that that might be in their

3    marketing.  It's not like they -- they don't enforce

4    anything like that.  They don't require any sort of

5    documentation or even require that it be purchased by

6    a business.

7    ███  ████████████████████████████████████████

8    ███████████████████████████████████████████████

9    ████████████

10   ███  ████████████████████████████████████████

11   ██████████████████████████████████████████████

12   ██████████████████████████████████████████████

13   ██████████

14   ███  ███████████████████████████████████

15   ██████████████████████████████████████████████████

16   ██████████████████████████████████████████████

17   ███████████████████████

18   ███  ██████████████████████████████████████

19   ████████████

20        Q.   Understood.  Thank you for the

21   clarification.  Who pays the Anveo bill?

22        A.   I, on occasion, or my mother.

23        Q.   When you say "on occasion," how often would

24   you say that is?

25        A.   I think I have paid it most of the time.  I

Page 176

1    think she might have paid it once or twice.

2        Q.   Do you know when the last time she paid it

3    was?

4        A.   No.

5        Q.   You said there's a monthly charge for that

6    number?

7        A.   Yes.

8        Q.   How much is that?

9        A.   I'm not sure.

10       Q.   Are you charged for each incoming call?

11       A.   Yes.

12       Q.   How much is that charge?

13       A.   It's in accordance with the rate deck that

14   they publish.

15       Q.   So how often do they publish a new rate

16   deck?

17       A.   I don't know.  Maybe once a quarter.  It

18   has every area code exchange combination and the

19   permanent charges for each one.

20       Q.   So does that mean that that it's based off

21   of where the call is originated from?

22       A.   You say "originated," but that would be

23   termination.  I guess, are you referring to

24   termination or origination?

25       Q.   Maybe layman's terms would be better.  Is

Page 177

CONFIDENTIAL

```
 1   it based off where the caller is calling from?
 2         A.   I want to say yes, but that doesn't sound
 3   right to me.
 4         Q.   Maybe we can short-circuit this and just
 5   answer this question:  Is there any type of incoming
 6   call for which there is not a charge associated with
 7   it?
 8         A.   Maybe for toll-free numbers, but I think
 9   even those are actually charged.  Yeah, I think
10   they're charged as well.  Last time I looked at the
11   rate deck, which was probably even before I signed up
12   ████████████████████████████████████████████████████
13   I think last time I looked at the rate deck they were
14   all the same price, or more or less other than maybe
15   somewhere out in the world where it was a little more
16   expensive.
17         Q.   Is that rate deck publicly available?
18         A.   You might need to create an account for it.
19         Q.   By that do you mean it's available maybe to
20   subscribers --
21         A.   Yes.  I think it's available for
22   subscribers, and it might even be on the website that
23   you can click on it before you subscribe.
24         Q.   You said there's also per-minute charge?
25         A.   Well, that is the per-minute charge that we
```

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company                      www.veritext.com

CONFIDENTIAL

1    were just talking about.

2        Q.    So in addition to the permanent charge, is

3    there any fixed charge that is just charged for every

4    incoming call?

5        A.    Yes.  If you select that you want to

6    receive caller ID information for the call, that

7    charge is I think 9/100ths of one cent, so .009.

8        Q.    Okay.  And then with text messages you

9    testified earlier there was a charge for every 160

10   characters?

11       A.    Yes, I believe it's one cent.

12       Q.    Is there a charge per text received beyond

13   that, or just based on that amount of characters?

14       A.    Just based on the number of 160 character

15   blocks.

16   ███      ████████████████████████████████████████

17   number was first acquired, how that number was

18   assigned?

19       A.    It was assigned from Verizon, I guess, when

20   they bought the house.  I don't even think we had

21   Internet at the time.  My parents bought the house

22   and I guess got the phone connected.

23       Q.    Do you know if that number was selected by

24   your parents, or just assigned by Verizon?

25       A.    I have no clue.

CitiCourt, the Reporting Group          801-532-3441
A Veritext Company                      www.veritext.com

CONFIDENTIAL



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20    Q.    Is that a cell phone?
21    A.    Yes.
22    Q.    Who is the carrier?
23    A.    Verizon Wireless.
24    Q.    Has it always been Verizon?
25    A.    For a time.  For maybe two or three years I
```

Page 180

1    charge for the archiving.

2         Q.   Then the line item for "incoming calls"?

3         A.   Incoming calls.  Permanent charges for

4    incoming calls.

5         Q.   "CNAM lookup"?

6         A.   Caller ID name.  Those are charges for --

7    every time that somebody calls you it will look up

8    the caller ID.

9         Q.   Is that something that you have to opt in?

10   Is that something you have to opt in to?

11        A.   If you want caller ID, you have to check

12   the box.

13        Q.   Is that done on a per-call basis or account

14   basis?

15        A.   That is done -- so the caller ID, once I

16   select -- each telephone number has a box to select

17   whether or not you want caller ID on that telephone

18   number.  Once you select that box, every call that

19   comes in is going to be charged for the lookup of

20   caller ID information, unless it is two calls from

21   the same caller ID within the same minute.

22        Q.   Is that due to some caching or other

23   technical aspect of the system that it won't charge

24   for information it already has?

25        A.   I assume it's cached somewhere in the Anveo

```
1    system that they don't charge for multiple caller ID
2    lookups within the same minute period, yes.
3         Q.   Do you have that box checked, so you got a
4    caller ID lookup on every incoming call?
5         A.   Yes.
6         Q.   The "phone number subscription" line item?
7         A.   That is the monthly charges for the phone
8    numbers that are on that account.
9         Q.   Is that a fixed amount per month?
10        A.   They changed the amount from time to time
11   for every certain period, but it's generally fixed.
12        Q.   What method of payment do you use when you
13   pay the Anveo account?
14        A.   PayPal.
15        Q.   And what email address is associated with
16   that PayPal account?
17   ███       ██████████████████████████████████████
18        Q.   And when Stefania pays the account, what
19   method of payment does she use?
20        A.   I believe she uses -- technically -- it's
21   probably not my PayPal account technically, even
22   though it has my email address.  I believe that she
23   set it up when I was a minor, and so her name is on
24   that account somehow, and my name is also associated
25   with that account.
```

Page 189

CONFIDENTIAL

1      Q.    Where does that account draw funds from?

2      A.    From my credit card.  In this case it was

3  probably from my credit card.

4      Q.    Is it able to draw funds from a checking

5  account?

6      A.    I think so.

7      Q.    Whose checking account?

8      A.    I believe mine is on there, and I think my

9  mother's is still on there.

10      Q.    On your 2020 taxes -- which you said you

11  have done?

12      A.    Yes.

13      Q.    Did you write off any payments made to

14  Anveo as a business expense?

15      A.    Yes.

16      Q.    Did you deduct amounts paid to Anveo from

17  anything reported on a Schedule C?

18      A.    No.

19      Q.    Did your mother write off any amounts paid

20  to Anveo as a business expense?

21      A.    No.

22            MR. PARONICH:  Hold on.  Objection.  You

23  can answer if you know.

24            THE WITNESS:  Not to my knowledge.  I

25  haven't seen their tax returns.

Page 190

CONFIDENTIAL

1      Q.    BY MR. MARIGONI:  What other numbers are

2   currently associated with this Anveo account?

3      A.    I believe currently the only number

4   ███████████████████████████████████████████████

5      ██      ██████████████████████████████████

6      A.    That is associated with another Anveo

7   account.

8      Q.    Okay.   And whose account is that?

9      A.    Mine.

10      Q.    So a different account also in your name?

11      A.    Yes.

12      Q.    What device is that phone number associated

13   with?

14      A.    It's not associated with a device, it's

15   associated with another Anveo account.

16      Q.    What device does it ring on if you call it?

17      ██   ████████████████████████████████████████

18   █████████████████████████████████████████

19      ██   ████████████████

20      ██   ██████████████████████████████████

21      ██   ███████████████████████████████████████

22   ███████

23      A.    So it will ring the same physical device,

24   however, I have -- like, old-fashioned phones you had

25   blinking lines for line 1, line 2, line 3, it will

Page 191

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 192

CONFIDENTIAL

1    when we look at your discovery responses in a minute.

2            Are there any numbers that you previously

3    had associated with Anveo that you no longer do?

4        A.   There's a few that I've had in the past.

5    ██      ████████████████████████████████████

6        A.   That's one of them.

7        Q.   What did you use that number for?

8        A.   That number was used for the Port Richmond

9    Business Alliance.

10       Q.   What is Port Richmond Business Alliance?

11       A.   Sort of like a local Chamber of

12   Commerce-type group.

13       Q.   So when you say it was used for that, do

14   you mean that was the contact number for that group?

15       A.   I'm not sure if they had other contact

16   numbers besides that.  When I was part of the

17   organization, Port Richmond section of Philadelphia,

18   ████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████

20   ███████████████████████████████████████████████

21   and use it for that.

22       Q.   Why do you no longer have that number?

23       A.   I left the Port Richmond Business Alliance.

24       Q.   Do you know if the number was ported to an

25   account held by another member of that group?

                                        Page 193

CONFIDENTIAL

```
 1              MR. PARONICH:  Object to form.  You can
 2    answer.
 3              THE WITNESS:  I believe at the time that I
 4    had the number I just relinquished it along with the
 5    Anveo account that it was in, and gave the
 6    credentials to that account.
 7         Q.   BY MR. MARGIONI:  Was that ever on the same
 8    ████████████████████████████████████████
 9         A.   No.
10    ██       ████████████████████████████
11         A.   That was a number for the Pennsylvania
12    Transit Expansion Coalition.
13         Q.   Pennsylvania what Expansion Coalition?
14         A.   Transit Expansion Coalition.
15         Q.   What is that entity or group?
16         A.   It was a group that advocated for rail and
17    public transit and mass transit services in the
18    Philadelphia area expansion of public transit.
19         Q.   Were you a member of that group?
20         A.   Yes.
21         Q.   Did you provide a phone line and number for
22    the group?
23         A.   Yes.
24         Q.   Is that what this was?
25         A.   Yes.
```

Page 194

1    Q.    And why do you no longer have this number?

2    A.    I left PA Tech.

3    Q.    And did you transfer the number or did you

4    relinquish it?

5    A.    I believe that was in its own separate

6    Anveo account for PA-TEC that I just transferred over

7    ownership of the Anveo account.

8    Q.    Do you know, was that an Anveo Direct

9    account?

10   A.    Most likely it was, yes.

11   Q.    Do you know who's providing a PBX for that

12   number at this time?

13   A.    Might still be Pennsylvania Telephone

14   Company.  I am not sure.

15   Q.    All right.

16   A.    The group I think is more or less dormant

17   at this point.  They might have even given up the

18   number.  No longer even use it.

19   ████  ████████████████████████

20   A.    I believe that was also for PA Tech.

21   Q.    Same disposition of that number?

22   A.    Yes.

23   ████  ████████████████████

24   A.    That number was also for PA tech.

25   Q.    Why did the PA Tech have a number with a

                                          Page 195

CONFIDENTIAL

1    New Jersey area code?

2         A.   So we also advocated for transit into New

3    Jersey and beyond, namely into South Jersey.

4         Q.   Were these numbers for the public to

5    contact this group?

6         A.   So there were a few things that we were

7    toying around with.  I think obviously one of them

8    was for the public to contact the group.  The other

9    thing that we wanted to do was put recordings on

10   those numbers.  I don't think we ever did, but put

11   recordings on those numbers with information as to

12   what project we had in that area so that you could

13   press one to hear, you know, about such and such

14   project, and if you want become involved in it, leave

15   a message.

16        Q.   Has that number been relinquished or turned

17   over to PA Tech?

18        A.   Yes.

19        Q.   Are there any other numbers that you're

20   aware of that were associated with your Anveo

21   account?

22        A.   Depends on what Anveo account we're talking

23   about.  There is, I think, one or two other numbers

24   that might have been with Anveo that were disclosed

25   in discovery.

Page 196