# EXHIBIT I

# Deposition of Craig Cunningham

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| CRAIG CUNNINGHAM, ROBERT HOSSFELD and ANDREW PERRONG, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) | Videotaped Deposition of:<br><br>CRAIG CUNNINGHAM |
| Plaintiffs, | ) ) | 2:19-cv-00568 |
| vs. | ) ) | Judge David B. Barlow |
| VIVINT, INC., and DSI DISTRIBUTING, INC., dba DSI SYSTEMS, | ) ) ) ) | Magistrate Judge Cecilia M. Romero |
| Defendants. | ) | |

June 8, 2021 * 9:34 a.m.

Deposition by Zoom

Reporter:  Lisa Bernardo, CSR, RPR

Videographer:  Ryan Reverman

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3              Anthony I. Paronich
                PARONICH LAW, P.C.
 4              Attorneys at Law
                350 Lincoln Street, Suite 2400
 5              Hingham, Massachusetts 02043
                Tel: 508.221.1510
 6              anthony@paronichlaw.com

 7
     FOR THE DEFENDANT VIVINT, INC.:
 8
                Jenny N. Perkins
 9              BALLARD SPAHR, LLP
                Attorneys at Law
10              1735 Market Street, 51st Floor
                Philadelphia, Pennsylvania 19103-7599
11              Tel: 215.864.8378
                perkinsj@ballardspahr.com
12
                Melanie J. Vartabedian
13              Nathan R. Marigoni
                BALLARD SPAHR, LLP
14              Attorneys at Law
                One Utah Center, Suite 800
15              201 South Main Street
                Salt Lake City, Utah 84111
16              Tel: 801.531.3000
                vartabedianm@ballardspahr.com
17              marigonin@ballardspahr.com

18   FOR THE DEFENDANT DSI DISTRIBUTING, INC:

19              Kathleen M. Liuzzi
                CHRISTIANSEN LAW, PLLC
20              Attorneys at Law
                311 South State Street, Suite 250
21              Salt Lake City, Utah 84111
                Tel: 801.716.7016
22              kathe@skclawfirm.com

23   ALSO PRESENT:

24              Andrew Perrong
                Bob Popovich
25              Meredith Foreman
```



 1          Q.    Do you record conversations that don't
 2   have anything to do with telemarketing?
 3          A.    I'm sure I do, yes.
 4          Q.    What kinds of conversations are those?
 5          A.    It's like I said, anyone who is not in my
 6   phone book.  So if it is, say, someone could be a
 7   wrong number, it could be a new friend I met and I
 8   didn't save the number.  Just anyone who is not saved
 9   in my phone book.
10          Q.    Do you disclose to the other person on the
11   other line that you are recording those calls?
12          A.    Generally not.
13          Q.    Why not?
14          A.    In Texas it's a one-party state, which
15   means only one person has to -- I'm sorry.  Only one
16   person who is a party to the conversation needs to be
17   aware of it, so I don't feel the need to do it.
18          Q.    What is the law as you know in
19   North Carolina?
20          A.    North Carolina is also a one-party state.
21          Q.    And is it, to the extent you know, is it
22   -- is the law applicable to where the recording is
23   being made or where the party that is being recorded
24   is located?
25                MR. PARONICH:  Object to form.  You may



 1   answer.

 2            THE WITNESS:  To my knowledge, it's where

 3   the recording is being made.

 4        Q.   (By Ms. Perkins)  How do you know this

 5   information?

 6        A.   I've read up on it and that's my

 7   conclusion.

 8        Q.   Did you research it before you started

 9   recording these types of calls?

10        A.   Yes.

11        Q.   Why?

12        A.   Because I don't like to break the law or

13   infringe on other people's rights.

14        Q.   Are there any telephone calls that you

15   received directly from Vivint, Inc., that are part of

16   this lawsuit?

17        A.   Yes.

18        Q.   And when were those telephone calls made?

19        A.   Those were made after the accounts were

20   created with Vivint.  They're usually to set up the

21   installation dates and times.

22        Q.   Were those -- do you consider those to be

23   telemarketing calls?

24        A.   No.  I don't think so.  Those are

25   actionable calls.



1       Q.    Are there any actionable calls made

2   directly by Vivint, Inc., that you are seeking

3   recovery for in this lawsuit?

4       A.    No.

5       Q.    Are there any text messages made by

6   Vivint, Inc., to you that you are seeking recovery

7   for in this lawsuit?

8       A.    No.

9       Q.    Now, we were talking about the in-house

10  counsel at Vivint that you spoke to.

11      A.    Yes.

12      Q.    When did you speak to him, approximately?

13      A.    There were several series of conversations

14  and communications we had.  This would be, generally

15  speaking, 2018 and 2019.

16      Q.    And is it fair to assume that you believe

17  you were receiving calls either for Vivint or on

18  behalf -- either from Vivint or on behalf of Vivint

19  sometime before 2018, and that's what precipitated

20  your conversations with Vivint's in-house counsel?

21      A.    Yes.

22      Q.    And what phone number were you receiving

23  calls on?

24      ████████████████████

25      Q.    Any other phone numbers?



CITICOURT
THE REPORTING GROUP

1          A.    I don't think so.

2          Q.    Besides Vivint, Inc., and DSI, are you

3     planning to add any other defendants to this lawsuit?

4          A.    No.

5          Q.    Are you planning to bring in any other

6     named plaintiffs in this lawsuit?

7          A.    No.

8          Q.    Tell me, without breaking any attorney-

9     client confidences, how you became and learned of

10    this lawsuit?

11               MR. PARONICH:  Objection.  You can answer

12    that.

13               THE WITNESS:  Yeah.  I'm not sure I

14    understand the question.

15         Q.    (By Ms. Perkins)  Okay.  When did you

16    learn that this lawsuit existed?

17         A.    Well, I talked to Anthony.  I mean, my

18    attorney filed the case on my behalf and I was aware

19    of what he was doing and he was filing the case on my

20    behalf.

21         Q.    But you weren't one of the original named

22    plaintiffs; is that right?

23         A.    I believe I was.  I'm sorry.  Correction.

24    It was just Andrew at the time, first for the

25    original Complaint.  I did not.  Yeah.



```
 1        Q.    When did you join this lawsuit?
 2        A.    That was in the Amended Complaint.  Yes,
 3   the Amended Complaint, document 24.
 4        Q.    Have you ever had a situation before where
 5   you joined in a complaint after the original
 6   complaint was filed?
 7        A.    Yes.
 8        Q.    What cases were those?
 9        A.    There was one against Lexington Law and
10   that wound up being -- there were several cases filed
11   that got consolidated.  That's one that jumps out of
12   my head.  Lexington Law.
13        Q.    So you would agree with me now, after -- I
14   should ask you, what did you review just now to
15   determine that you weren't originally named a
16   plaintiff in this lawsuit?
17        A.    I looked at PACER.
18        Q.    Do you have a PACER account?
19        A.    I do.
20        Q.    And how long have you had a PACER account
21   for?
22        A.    Several years.  At least five years.
23        Q.    Do you file things with PACER?
24        A.    Generally not.  I have done it a few times
25   several years ago, but, generally, I don't have a
```



 1   TCPA filing account.

 2        Q.    What do you use PACER for?

 3        A.    Just to review the cases, look at

 4   documents and stay up with the current happenings.

 5        Q.    How often do you go on PACER?

 6        A.    Three, four times a week.

 7        Q.    And do you check your lawsuits or other

 8   things on PACER?

 9        A.    Sometimes my lawsuits, sometimes other

10   people.  Sometimes it's just research.

11        Q.    How do you search your cases on PACER?

12   Walk me through what you do on PACER.

13        A.    So they have a search function where you

14   can look via party name and so I just usually put my

15   name in and search that way.

16        Q.    Do you ever have any other Craig

17   Cunninghams come up that aren't you?

18        A.    Sure.

19        Q.    And do you pay a per month service for

20   using PACER?

21        A.    It's not a per month service.  To my

22   knowledge, it's per page viewed.  There may be a

23   minimum charge, but, as I recall, it's per page

24   viewed.

25        Q.    So every time you click on a document and



 1   want to open it up, you are charged from PACER for

 2   it?

 3        A.    Correct.

 4        Q.    And how do you pay your PACER bills?

 5        A.    I pay with a credit card.

 6        Q.    Which credit card is that?

 7        A.    Usually, again, whichever one is closest

 8   to me.  Just a personal credit card.

 9        Q.    Do you not have it on automatic?

10        A.    No.  But that's probably -- I don't recall

11   seeing that option, but I just pay the bill when its

12   due.

13        Q.    And are you charged each time you open up

14   the document, or are you given a bill at the end of

15   the month or the end of the week?

16        A.    It's usually at the end of the month when

17   a bill is generated.

18        Q.    What was your bill last month for PACER?

19        A.    It's like $100, 120.  Something like that.

20        Q.    Is that average how much you spend on

21   PACER each month?

22        A.    It really varies.  That might be a little

23   bit lower than average.  Maybe it's 200.

24        Q.    Do you have copies of the documents that

25   were filed on your behalf without looking in PACER?



1      A.    You're referring to this case?

2      Q.    In this case, sir.

3      A.    Yes.

4      Q.    Understood.  So as we just established,

5  you were not originally a named plaintiff in this

6  lawsuit.  How did you learn about this lawsuit?

7      A.    I don't recall.  I mean, it was a search

8  in PACER to what -- to see if -- as I've said, I had

9  previous complaints against Vivint for unwanted

10  telemarketing calls, but I think I just looked at

11  PACER.

12      Q.    And did you discover the lawsuit on your

13  own behalf or did somebody tell you about the

14  lawsuit?

15      A.    I remember -- I don't recall when or how I

16  learned about it, but I believe I looked at PACER and

17  saw a new case.

18      Q.    At the time you saw it, did you recognize

19  the named plaintiff's name?

20      A.    I did.

21      Q.    And did you reach out to Mr. Perrong about

22  this lawsuit?

23      A.    I have discussed the lawsuit with Andrew,

24  yes.

25      Q.    Prior to becoming a named plaintiff -- and



 1    I'm not asking what you discussed with him, I'm

 2    asking you if you reached out to him about this

 3    lawsuit?

 4         A.    I don't recall specifically reaching out

 5    to him about it.  I'm sure we talked about it.  As I

 6    said, Andrew and I talk several times a week.

 7         Q.    When did you decide that you were going to

 8    become a party in this litigation?

 9         A.    It was around the time the Complaint was

10    amended.

11         Q.    For the first time?

12         A.    Yes.

13         Q.    And have you ever sued Vivint in court

14    before?

15         A.    No.  I don't think I ever actually sued

16    Vivint in court.

17         Q.    And at the time that you -- let me scratch

18    that.  When did you learn this case was a class

19    action?

20         A.    Oh, I knew when I read the Complaint.

21         Q.    And what is your understanding, if any, of

22    what a class action is?

23         A.    A class action is a way of resolving

24    multiple claims, most are similar -- sorry.  A class

25    action is a way of resolving multiple similar cases


CITICOURT
THE REPORTING GROUP

 1   as opposed to filing multiple individual actions and,

 2   say, it is for the benefit of the class and people

 3   who received similar calls.

 4        Q.   And do you know where this -- what court

 5   this case was filed in?

 6        A.   Yes.  It's in Utah.

 7        Q.   And do you know why it was filed in Utah?

 8             MR. PARONICH:  Hold on, Craig.  I just

 9   have to object with respect to any specific

10   conversations we had in reviewing those.  But subject

11   to that limitation, you can answer that.

12        Q.   (By Ms. Perkins)  Obviously, the case was

13   filed before you had an attorney-client relationship

14   about this case, I would assume.  So I'm just asking

15   you if you know why it was filed in Utah?  You can

16   say yes or no.  I'm not asking for any communications

17   you had with Mr. Perrong about it.

18             MR. PARONICH:  Hold on.  I just want to

19   clarify and make sure I have a well-founded

20   objection.  Jenny, do you mean originally why it was

21   filed in Utah?

22             MS. PERKINS:  Yes.

23             MR. PARONICH:  Well, then I apologize.  I

24   misunderstood.  I don't have any objection to that.

25   You should answer, Craig.



```
 1              THE WITNESS:  Okay.  Can you repeat the
 2    question one more time?
 3         Q.   (By Ms. Perkins)  Sure.  Do you know why
 4    this case was originally filed in Utah?
 5         A.   Generally speaking, it's my understanding
 6    you need to file the case where the damages happened
 7    or where the defendant resides, and it is my
 8    understanding that Vivint is headquartered in Utah.
 9         Q.   So the cases that we talked about that you
10    filed in Texas in either state court or small claims
11    court, were the defendants -- did they reside in
12    Texas?
13         A.   Some of them did.  Some of them didn't.
14    But it also could be argued that some of the damages
15    occurred in Texas as that's where the calls were
16    received.
17         Q.   Okay.  Have you ever filed -- apart from
18    this case, have you ever filed a lawsuit in the
19    district of Utah before?
20         A.   I think, yeah, I've had a few cases that
21    were filed there.
22         Q.   Do you know if you have any open cases in
23    Utah right now?
24         A.   I think there's one against a CBD company.
25    The name of them escapes me right now, but I think
```



CITICOURT
THE REPORTING GROUP

 1    it's generally a CBD product that was being sold.

 2         Q.   And what is your role, to the extent you

 3    know, in this litigation?

 4         A.   Well, I'm a lead plaintiff in this case.

 5         Q.   How does your role at all differentiate

 6    with Mr. Perrong's role in this case?

 7         A.   He's is also a lead plaintiff.

 8         Q.   Do you have any distinct roles in this

 9    litigation, that you know of?

10         A.   I'm not sure I understand the question as

11    far as a distinct role versus mine versus his.

12         Q.   Sure.  Are you aware of any duties or

13    obligations that you have in this case that

14    Mr. Perrong does not have?

15         A.   I think we have the same roles as lead

16    plaintiffs.

17         Q.   And who is the other named plaintiff in

18    this lawsuit?

19         A.   Yes.  It's Robert Hossfeld.

20    H-o-s-s-f-e-l-d.

21         Q.   Have you ever met Robert before this

22    lawsuit?

23         A.   No.

24         Q.   Have you ever spoken to him before this

25    lawsuit?



 1          A.    No.

 2          Q.    Ever been named plaintiffs with him

 3     before?

 4          A.    I don't think so.  No.

 5          Q.    You said Mr. Perrong is another plaintiff

 6     in this litigation.  Have you spoken to him about

 7     this case outside the presence of Mr. Paronich?

 8          A.    We may have.

 9          Q.    What did you talk to him about?

10          A.    As I recall, I think I just asked if he's

11     suing Vivint and to confirm it's the same Vivint that

12     I dealt with before.

13          Q.    Have you ever spoken to him about just DSI

14     or Vivint in general?

15          A.    No.  I don't -- I don't recall doing that.

16          Q.    And you have spoken to him on many

17     occasions before, just generally about the Telephone

18     Consumer Protection Act?

19          A.    You asked kind of two questions there, a

20     general and a specific one.

21          Q.    Have you in the past spoken to Mr. Perrong

22     about -- in general, about the TCPA, not a specific

23     case, but in general about the TCPA?

24          A.    Yes.  I have discussed the TCPA with

25     Andrew before.



Craig Cunningham  *  June 08, 2021                     110

 1        Q.    And what did you discuss?

 2        A.    I don't really recall.  Usually it's -- if

 3   he's, you know, familiar with the defendant, maybe he

 4   sued someone before.

 5        Q.    Do you know how many TCPA cases

 6   Mr. Perrong has filed?

 7        A.    No, I don't.

 8        Q.    Do you know if you have filed more than

 9   him?

10        A.    I believe I have.

11        Q.    Was that from, like, a PACER search?

12        A.    Yes.

13        Q.    Do you know why Mr. Perrong is here today

14   attending your deposition?

15        A.    I'm not sure I understand the question.

16        Q.    Do you know why Mr. Perrong is attending

17   your deposition today?

18        A.    I can testify as far as me, but he's aware

19   of the case and the deposition and he wanted to

20   attend, is my best estimate of it.

21        Q.    When did you learn he was going to be

22   attending today's deposition?

23        A.    Friday, I think.  Friday or Saturday.

24        Q.    What is Jared Berrett's role in this case?

25        A.    He's an attorney.



Craig Cunningham  *  June 08, 2021

111

```
 1          Q.    Is he your attorney?

 2          A.    Yes.

 3               MR. PARONICH:  I'm sorry, Jenny.  Do you

 4    mean Jared Pearson?

 5               MS. PERKINS:  No.  I mean Jared Barrett.

 6               MR. PARONICH:  My apologies.

 7          Q.    (By Ms. Perkins)  So Jared Barrett is one

 8    of your attorneys in this case?

 9          A.    Yes.

10          Q.    What is Mr. Hossfeld's role in this case?

11          A.    He's also lead plaintiff.

12          Q.    And why isn't he here today for the

13    deposition?

14          A.    I can't speak about other people's

15    schedules and so forth.  My best guess is he isn't

16    here because he didn't want to attend.

17          Q.    Do you know if he knows the deposition is

18    occurring right now?

19          A.    I can't testify to other people's

20    knowledge and information.

21          Q.    Did you communicate to him that you were

22    sitting for a deposition today for the Vivint case?

23          A.    No.

24          Q.    Have you spoken to Mr. Hossfeld about this

25    case?
```



 1          A.    No.

 2          Q.    Have you spoken to Mr. Hossfeld at all

 3     about any subject?

 4          A.    No.

 5          Q.    Have you ever met him?

 6          A.    No.

 7          Q.    Have you heard about him before becoming

 8     involved in this lawsuit?

 9          A.    No.

10          Q.    Have you spoken to Mark Fitzhenry about

11     this lawsuit?

12          A.    No.

13          Q.    Do you know who Mark Fitzhenry is?

14          A.    Yes.

15          Q.    Have you ever spoken to him before?

16          A.    Yes.

17          Q.    What did you speak to him about?

18          A.    We've talked about real estate.  We've

19     talked about South Carolina.  We've talked about some

20     of his family and just keeping in touch with him.

21          Q.    How do you know him?

22          A.    I know he's a TCPA -- I know he's filed

23     TCPA cases, generally consider him a friend.

24          Q.    And when did you meet him?

25          A.    I've never actually met Mark in person.



1     Q.    When did you become acquainted with him?

2     A.    I would say several years ago.  Two or

3   three years ago.

4     Q.    Who made the initial contact?

5     A.    I don't recall.  My best guess is I

6   reached out to him and called him.

7     Q.    Is he somebody that you would have

8   programmed in your cell phone number -- in your cell

9   phone?

10     A.    He is.

11     Q.    How often do you speak to Mr. Fitzhenry?

12     A.    Every few months.

13     Q.    When is the last time you spoke to him?

14     A.    I don't recall the exact date.

15     Q.    Ever speak to him about Vivint?

16     A.    Not to my knowledge, no.

17     Q.    Ever speak to him about DSI?

18     A.    Not to my knowledge, no.

19     Q.    Ever speak to him about any of his TCPA

20   litigation?

21     A.    I'm sure it's come up periodically.

22   Again, if we have a -- if I have question, if he has

23   experience with a defendant, we might have talked

24   about that.

25     Q.    Have you spoken to anyone else that I have



Craig Cunningham  *  June 08, 2021

114

 1    not mentioned today about this lawsuit?

 2         A.    No.

 3         Q.    Who is Diana Mey?

 4         A.    Diana Mey is a nice lady who lives in West

 5    Virginia.

 6         Q.    How do you know her?

 7         A.    I know she's very -- she's also a consumer

 8    advocate and she's filed TPCA cases as well.

 9         Q.    Do you ever speak to her about this case?

10         A.    No.

11         Q.    Is she somebody whose cell number you

12    would have programmed into your cell phone?

13         A.    Yes.

14         Q.    How often do you speak to Ms. Mey?

15         A.    Periodically, every -- maybe a few times a

16    month.

17         Q.    Mr. James Shelton, how do you know him?

18         A.    He's a friend in common with Andrew as

19    well and I've talked to him.

20         Q.    What do you talk to him about?

21         A.    We talk about traveling.  We talk about

22    business.  We talk about the stock market.  Just

23    general guy talk.

24         Q.    What business is Mr. Shelton in?

25         A.    James Shelton collects judgments.

Craig Cunningham  *  June 08, 2021                    126

```
 1          Q.    Have you been asked to read it?

 2          A.    It's on my list to do.

 3          Q.    But you haven't read it before it was

 4    filed with the court; is that correct?

 5          A.    I don't think so.

 6          Q.    Do you have any social media accounts,

 7    sir?

 8          A.    Yes.

 9          Q.    Which ones?

10          A.    I can't name them all, but whatever

11    qualifies for social media, but I'm on Facebook

12    and Instagram.

13          Q.    What is your name on Facebook?

14          A.    Just Craig Cunningham.

15          Q.    Is it a private account or can the public

16    see it?

17          A.    I don't know.  I would have to check the

18    settings, but I believe -- again, I'm not super privy

19    to all of the current privacy settings too.

20          Q.    Are you Facebook friends with Mr. Perrong?

21          A.    No.  I don't think so.

22          Q.    Are you Facebook friends with

23    Mr. Paronich?

24          A.    No.

25          Q.    Do you have an Instagram account?
```



CITICOURT
THE REPORTING GROUP

```
 1            A.    I do.
 2            Q.    What is your handle, if you will, or is
 3    that Twitter?  I have to get up with the -- what is
 4    your name or handle on Instagram?
 5            A.    Instagram is Brown Hulk Smash.
 6            Q.    Can you spell that, please?
 7            A.    Brown, B-r-o-w-n, Hulk, H-u-l-k, Smash.
 8            Q.    And is that a private setting?
 9            A.    Again, I think friends can view me.  I'm
10    not quite sure what you mean by "private setting."
11    It's a --
12            Q.    If I were to pull up Instagram right now
13    and search, would I be able to find your account, if
14    you know?
15            A.    Yes.
16            Q.    Do you have a Twitter handle?
17            A.    I think I have an account there, but I
18    don't really use it much.
19            Q.    Do you remember the name?
20            A.    No.
21            Q.    Do you have a particular account?
22            A.    No.
23            Q.    Are there any other forms of social media
24    that I haven't asked about that you are aware of that
25    you have an account in?
```



Craig Cunningham  *  June 08, 2021                    128

```
 1         A.    Sure.  I mean, there's -- I've been on gun
 2   message boards, gaming message boards, many different
 3   ones over the years.  Some are active, some I'm not
 4   active on.
 5              MR. PARONICH:  Jenny, when you get to a
 6   logical breaking point.  We've been going about 90,
 7   but I want to let you finish your flow.
 8              MS. PERKINS:  Of course.
 9         Q.    (By Ms. Perkins)  Have you posted about
10   this case anywhere?
11         A.    No.
12         Q.    Do you plan to post about this case
13   anywhere?
14         A.    No.
15              MS. PERKINS:  Okay.  Why don't we take a
16   break?
17              MR. PARONICH:  And, Craig, do another ten
18   minutes?
19              THE WITNESS:  That sounds good.
20              MR. PARONICH:  Is that good for everyone
21   else?
22              MS. PERKINS:  So why don't we get back
23   here at 1:30 Central.
24              MR. PARONICH:  Perfect.
25              MS. PERKINS:  Oh, no, sorry, that's not
```



 1   fair.  1:40 Central.

 2            MR. PARONICH:  That's what I assumed you

 3   meant, but, yeah.

 4            MS. PERKINS:  We have offices in every

 5   state, so all day long I'm confusing time zones.  All

 6   right.  So we'll be back.

 7            MR. PARONICH:  Yes.

 8            THE VIDEOGRAPHER:  Going off the record.

 9   The time is approximately 12:29 p.m.

10            (Break)

11            THE VIDEOGRAPHER:  Returning on the

12   record.  12:41 p.m. is the time.

13            Counsel.

14       Q.    (By Ms. Perkins)  Mr. Cunningham, you're

15   seeking to serve as a class representative, along

16   with Mr. Perrong and Mr. Hossfeld, in this case that

17   we are here to talk about today, correct?

18       A.    Yes.

19       Q.    What is your understanding of the duties

20   of a class representative?

21       A.    My duties are to represent the class on

22   their behalf collectively as opposed to my own and

23   essentially supporting my personal direct interest to

24   what is best for the class.

25       Q.    So you're supposed to at times put the



Craig Cunningham  *  June 08, 2021                    130

 1    class's interest above your own?

 2         A.    Correct.

 3         Q.    Have you ever served as a class

 4    representative before in a TCPA case?

 5         A.    Yes.

 6         Q.    What cases were those?

 7         A.    There have been several.  Cunningham

 8    versus -- I'm just going to say Cunningham because

 9    sometimes there are many plaintiffs in the case.

10         Q.    Understood.

11         A.    But Cunningham vs. DirecTV.  There's

12    Cunningham vs. Lexington Law.  Cunningham versus -- I

13    can't think of the defendant's name.  There's another

14    alarm one.  There have been several.  Several over

15    the years, several going at the same time.

16         Q.    More than five?

17         A.    More than five what?

18         Q.    More than five times where you have been

19    appointed as a class representative?

20         A.    Yes.

21         Q.    More than ten?

22         A.    Yes.

23         Q.    More than 20?

24         A.    Yes.  I believe so.

25         Q.    More than 30?



1        A.      I'll say somewhere between 20 and 30.

2        Q.      And in those situations where you were

3    appointed as a class representative, was that based

4    on a settlement -- let me rephrase that, sir.  When

5    you were appointed as a class representative, did the

6    defendant or defendants oppose your appointment as a

7    class representative?

8        A.      There may have been a few times, like two

9    or three times, where someone tried to challenge it.

10   But, no, generally, they did not.  That has not been

11   my experience.

12       Q.      And what were those two times where

13   somebody tried to challenge it?

14       A.      It was in the form of a motion to

15   disqualify or dismiss, something along those lines,

16   that said I'm not -- again, I don't remember the

17   specifics of the case or arguments made.  I just seem

18   to remember someone was claiming I wasn't an adequate

19   representative for whatever reason they said.

20       Q.      And did the court or tribunal ever rule on

21   either the motion or the proffer to disqualify you as

22   a class representative?

23       A.      I think so, yeah.  I don't think I've

24   never been -- I've never been disqualified as a class

25   representative in any circumstance or...



```
 1            Q.    Have you ever been named a class
 2    representative in a case where the certification of
 3    the class was opposed by the defendant or the
 4    defendants?
 5            A.    Yes.
 6            Q.    In what instances were those?
 7            A.    So these were certifications sought fairly
 8    early in the case and there was a motion to certify
 9    the class and the defendants didn't want to certify
10    the class.
11            Q.    And a court overruled the defendants'
12    objection to the certification and you became a class
13    representative?
14            A.    So that's -- again, my understanding,
15    that's not how it works.  When I file a case --
16    excuse me.  When I file a case as a class action, I'm
17    a class representative until and unless I'm
18    disqualified or we settle the case on an individual
19    basis or something like that.
20            Q.    Have you ever been named a class
21    representative when the certification of the class
22    itself was opposed by the defendant or the
23    defendants?
24            A.    Yes.
25            Q.    What case was that?
```



 1       A.    Again, I think it was one of Aytan's cases

 2  and, I think, a Lexington Law case.  That was a

 3  little confusing because there's several class cases

 4  that went to the -- trying to get to an NBL, and it

 5  was just a big mess, but there was an opposition to

 6  class certification by the defendants.

 7       Q.    Did the court ever rule definitively on

 8  the defendants' opposition to the class

 9  certification?

10       A.    I don't think the court ruled on it

11  definitively.  But, again, without looking at

12  documents, it's a little hard to say and there's

13  several cases and that was several years ago.

14       Q.    I will tell you that I have done my

15  research, sir, and I am not aware of any federal case

16  where a motion to certify a class with you as the

17  named class representative was ultimately approved by

18  a court when there was an opposition propounded or

19  filed by the defendant.

20       A.    Okay.

21       Q.    Do you have anything to refute the

22  research that I have done?

23       A.    No.

24       Q.    Okay.  Have you ever been named a class

25  representative in a non-TCPA case?



 1        A.    I don't think so.

 2        Q.    Have you ever sought to certify a non-TCPA

 3   class?

 4        A.    No.

 5        Q.    I believe earlier in your days of filing

 6   complaints you may have filed some complaints under

 7   the Fair Debt Collection Practices Act.  Are you

 8   familiar with that term?

 9        A.    I am.

10        Q.    Have you ever served as a class

11   representative in a Fair Debt Collection Practices

12   Act claim?

13        A.    I don't think so, no.

14        Q.    And are you aware of any court ever

15   holding that you could not adequately serve as a

16   class representative?

17        A.    No.

18        Q.    If this case is certified as a class, do

19   you know what type of relief is available to you?

20        A.    There's damages, there's injunctive

21   relief, costs and fees as well.

22        Q.    Does the relief that's available to you at

23   all differentiate than the relief that's available to

24   Mr. Perrong?

25        A.    I be -- again, I'm not quite sure what



1    you're asking.

2         Q.    Are you and Mr. Perrong eligible for the

3    same type of relief if this case is certified as a

4    class action?

5         A.    My understanding is relief to the class,

6    not relief to me or Andrew specifically.

7         Q.    So you personally are not -- you do not

8    believe that you personally are entitled to relief if

9    a class is certified in this case?

10        A.    That's not what I'm saying.

11        Q.    What are you saying?

12        A.    I'm part of a class as an elevated status

13   as a class representative, but the relief is fairly

14   apportioned across the class and other than an

15   incentive award, that's about it.  That's for serving

16   an elevated status as a class representative.

17        Q.    What is an incentive award?

18        A.    It's an award that courts can grant in

19   their discretion to a class representative for

20   advocating on behalf of the class.

21        Q.    Is that something that you are seeking in

22   this case?

23        A.    As I understand it, that's something that

24   happens at a later process, certified and so forth.

25        Q.    If the class is certified, do you have an



Craig Cunningham   *   June 08, 2021                  136

```
 1    intention to seek an incentive payment as the class

 2    representative?

 3         A.    Yes.

 4         Q.    Have you ever received an incentive

 5    payment?

 6         A.    Yes.  In the Lexington Law case, I recall

 7    there was one.

 8         Q.    Where was that case filed?

 9         A.    I think it was Utah.

10         Q.    How much did you receive as an incentive

11    payment?

12         A.    I want to say it was about $2500.

13    Something around that range.

14         Q.    Did you receive any other monetary damages

15    in addition to the incentive payment?

16         A.    No.

17         Q.    And is that the only time you received an

18    incentive payment?

19         A.    Correct.

20         Q.    Have you received any compensation at all

21    so far in your role in this case?

22         A.    No.

23         Q.    If this case is certified as a class, what

24    do you understand your role would be?

25         A.    Well, I have to testify.  Deposition,
```

1  obviously.  I have to attend court.  Produce records,

2  documents.  Respond to discovery.  Things like that.

3       Q.    How many open cases do you have right now

4  where you are seeking to serve as a class

5  representative?

6       A.    I can generally say something like ten to

7  15 cases total right now open, and maybe five class

8  cases where I'm serving as class rep.

9       Q.    And how many cases do you file a month?

10      A.    It really depends on the month, what is

11 going on.  Travel.

12      Q.    How many cases did you file in May?

13      A.    I don't recall.  Somewhere around three to

14 five, maybe.

15      Q.    How many cases do you usually file a year?

16      A.    Again, it varies as far as travel

17 schedule, business, other interests and things that

18 I'm doing.

19      Q.    Have you ever served as an appointed class

20 representative in multiple cases at the same time?

21      A.    Yes.

22      Q.    What cases were those?

23      A.    I mean, I generally have several class

24 cases going, as well as several individual cases

25 going at the same time going back for several years,



1   so it's really hard to say.  As an example, I'll just

2   give you a current one.  So there's Cunningham vs.

3   AT&T and there's Cunningham vs. DSI and Vivint.  And

4   there's a CBD one.  Those are all class cases.  There

5   is a class rep at the same time.

6         Q.    And what is the status of the AT&T case

7   right now?  Where is it along in the proceedings?

8         A.    They've amended the Complaint several

9   times.  Had some discovery.  Some of the defendants

10  have been dismissed or defaulted.  Just, it's a lot

11  of case and a lot -- there's a lot of stuff going on

12  with it.  So many, many, several, multiple

13  plaintiffs, several defendants and new ones are

14  getting identified and added on it.  So it's just a

15  lot going on.

16        Q.    So you're still in class discovery?

17        A.    Yes.  As I recall, yes.

18        Q.    And what is the status of the CBD case you

19  are referring to?

20        A.    The CBD one, they have declared

21  bankruptcy, one of the corporations, and so that kind

22  of put everything on pause, whether it's a stay, an

23  automatic stay, and I believe we're looking to amend

24  to bring in the -- some of the owners and other

25  parties.



1      Q.    Okay.  Now, will your duties to serve as a

2   class representative in this case at all be impacted

3   with your duties to serve as a class rep in the other

4   100-plus cases, or, I'm sorry, the other 15 to

5   20-plus cases that are active right now?

6      A.    No, it doesn't impact my duties at all.

7      Q.    How much time of day do you devote to your

8   TCPA cases?

9      A.    It varies with travel and business,

10   workouts, other things I have going on.  I would say,

11   obviously, today I'm spending a lot, several hours,

12   other days it's none.  So maybe an hour, two hours,

13   maybe, a day.  Generally, weekends are less busy and

14   during the week it's more.

15      Q.    If this case were to be certified and go

16   to trial, are you able to travel to Utah for the

17   trial?

18      A.    Sure.

19      Q.    Are you currently vaccinated?

20      A.    I am.

21      Q.    Do you have any issues with traveling to

22   Utah?

23      A.    No issues.

24      Q.    Have you spoken to any other members of

25   the class that you are seeking to certify?

 1        A.    No.  Well, let me be clear.  I don't think

 2   we have identified all the class members, but to my

 3   knowledge, no.

 4        Q.    What is the class that you are seeking to

 5   certify in this litigation?

 6        A.    Well, there's three classes.  There's

 7   people who received text messages, people who

 8   received calls, and then there's people who --

 9   basically that -- where they received violations of

10   the telemarketing regulations, so all of them.

11        Q.    Which telemarketing regulations?

12        A.    Number 47 CFR 64.12.

13        Q.    So there's a telephone call class, there's

14   a text message class and then there's a --

15        A.    Telemarketing regulations.

16        Q.    -- telemarketing.  Okay.  And are you

17   seeking to be appointed as a representative for all

18   three of those classes?

19        A.    Yes.

20        Q.    Do you know when the close of discovery is

21   in this case?

22        A.    I'm not sure of the date.  It's on the

23   scheduling order.

24        Q.    And are you planning to seek to certify

25   all three of these classes in this case?



 1        A.    Yes.

 2        Q.    Are any of your co-plaintiffs also seeking

 3    to certify any of the three classes that you just

 4    mentioned?

 5        A.    I'm sure they are, but you would really

 6    have to ask them.

 7        Q.    And who would be a member of the three

 8    classes that you are seeking to certify?  I

 9    understand that you don't make that determination,

10    but what are the characteristics of the individuals

11    that would be a member of the three classes that you

12    are seeking to certify?

13             MR. PARONICH:  Objection.  You can answer.

14             THE WITNESS:  I think there would be

15    people who have cell phones who received calls or

16    text messages or had their rights violated otherwise

17    by -- had their rights under the telemarketing

18    regulations violated in other fashions.

19        Q.    (By Ms. Perkins)  And received calls from

20    whom?

21        A.    Vivint, DSI, or any of their other

22    representatives, marketers, or agents.

23        Q.    So it's when Vivint made the call or text

24    message.  Would you agree with me?

25        A.    Can you give me a complete sentence?



 1        A.   That's talking about the number of

 2   sign-ups, but I think --

 3        Q.   Three to five, okay.

 4        A.   Three to five, yes.

 5        Q.   What was the purpose of the Vivint persons

 6   coming to your home?

 7        A.   They wanted to do the install.

 8        Q.   Did you ever permit Vivint to do an

 9   install?

10        A.   Yeah, I've never had it installed.

11        Q.   So you never permitted them to do an

12   install?

13        A.   Correct.

14        Q.   So did you cancel the install when they

15   arrived?

16        A.   Either that or before.

17        Q.   Have you ever had an incident where you

18   canceled an install but they still showed up?

19        A.   I believe that's happened several times,

20   yes.

21        Q.   And how do you typically cancel the

22   installs?

23        A.   I just call the 800 number.

24        Q.   Do you have that number programmed into

25   your phone?



1      A.    No.

2      Q.    When was the first time you heard of

3  Vivint?

4      A.    When I started getting the calls about

5  Vivint alarm systems.

6      Q.    You didn't hear about them beforehand?

7      A.    No.

8      Q.    Ever see their trucks in your various

9  neighborhoods?

10     A.    I'm sure I have.

11     Q.    Ever been on their website?

12     A.    Again, briefly, to identify the calls so I

13  could look at the number to reach somebody.

14     Q.    Do you have any family members or friends

15  who have ever obtained security systems from Vivint?

16     A.    I'm sure several of my friends have.  I

17  have not discussed it with them.

18     Q.    And the services that you have signed up

19  for in the past with Vivint, what were they?

20     A.    An alarm system.

21     Q.    Just a generic alarm system?  Was there

22  anything else?

23     A.    I think it had cameras as an option on

24  some of them.

25     Q.    Did you ever sign up for a camera?



 1        A.    I may have.  I don't really remember the

 2   details of every sign-up, all the packages.

 3        Q.    When you signed up for these services, how

 4   did you do that?

 5        A.    I received a phone call.  They asked if I

 6   then wanted Vivint services.  I said yes.  I gave

 7   them a credit card and they sent me the, you know,

 8   sign-up information later with the account number.

 9        Q.    And you called Vivint to sign up as

10   opposed to Vivint calling you to sign up?

11        A.    Incorrect.  Vivint called me or agents

12   thereof.

13        Q.    Did you sign up when Vivint or Vivint

14   agents called you or did you independently call

15   Vivint and sign up?

16        A.    I signed up when Vivint's agents called

17   me.

18        Q.    Do you fill out an application?

19        A.    Not really.  They asked some questions and

20   I gave them my information.

21        Q.    What questions did they ask?

22        A.    The address, the type of system.  They

23   went over the pricing and so forth during the call.

24        Q.    Did you give them your phone number?

25        A.    Did I what?



1      Q.    Did you give them your phone number?

2      A.    No.  They already had my phone number.

3      Q.    Did they ask you if they could call you on

4  that phone number?

5      A.    They may have.

6      Q.    Did you record those calls?

7      A.    Yes.

8      Q.    Did you ever tell anyone at Vivint that

9  you didn't want them to call you?

10     A.    Oh, yes.  I made that abundantly clear.

11     Q.    How did you make that abundantly clear?

12     A.    I talked to Rich Goates, who, at the time,

13  was in-house counsel for Vivint.  He called me on my

14  ██████████  phone number.

15     Q.    Okay.

16     A.    It was on many of the emails that we

17  discussed.  And we exchanged phone records and all of

18  that.  So he knew that I -- what my number was.  Rich

19  Goates knew I did not want to receive calls at that

20  number.  And, again, we discussed that point several

21  times over several series of calls.

22     Q.    And at the point that you signed up for

23  Vivint services, were you speaking with Vivint

24  individuals?

25     A.    Or someone with DSI agents.



```
 1          Q.    Do you know anyone who works for Vivint
 2   currently?
 3          A.    No.
 4          Q.    Do you know anyone who works for DSI
 5   currently?
 6          A.    No.
 7          Q.    So the 64 or so calls and/or text messages
 8   that you received in this lawsuit, those were all
 9   made to the phone number ███████████
10          A.    Correct.
11          Q.    So that's the only phone number at issue
12   in this lawsuit for Mr. Cunningham?
13          A.    Yes.
14          Q.    When did you start using the ████ phone
15   number?
16          A.    At least five years ago.
17          Q.    Are you currently using it?
18          A.    I do.
19          Q.    Do you have it with you today?
20          A.    It's in the house.
21          Q.    And is it ported to a cell phone?
22          A.    It's not ported to a cell number.  I would
23   not describe it as that.  It is a cell phone.
24          Q.    So if I call that number right now, a cell
25   phone would ring that's in your house?
```



 1          A.    Correct.

 2          Q.    And would it ring if it didn't recognize

 3    my phone number?

 4          A.    Would it ring?

 5          Q.    Yes.

 6          A.    Yes, it would ring.

 7          Q.    Would it record a message that I left for

 8    you if you didn't answer it?

 9          A.    No.  No recording.  That message would go

10    to voicemail and if it is not full, you can leave a

11    message on my voicemail.

12          Q.    If you picked up that call from -- I have

13    a 954 area code.  If you picked up that call and

14    didn't recognize it if it wasn't -- you and I have

15    never met before, so I assume you don't have my cell

16    phone number in your phone, would it automatically

17    record our conversation?

18          A.    Yes, it would.

19          Q.    And what kind of cell phone do you have

20    for the ███ phone number?

21          A.    The cell phone is a Pixel 3.  Google Pixel

22    3.

23          Q.    How long have you had that phone?

24          A.    This one is a little bit new.  Actually,

25    it's a Pixel 4.



CitiCourt

THE REPORTING GROUP

```
 1            Q.    Pixel 4, okay.
 2            A.    Yeah.  So I got that specific device in
 3    March, I think.  So fairly -- not too long ago.
 4            Q.    And did you get the device through
 5    Republic Wireless or did you get it elsewhere?
 6            A.    No.  Verizon.
 7            Q.    Verizon?
 8            A.    Yes.
 9            Q.    Are there any other phone numbers that I
10    could call you that would cause your Pixel 4 Google
11    phone number to ring?
12            A.    I don't think so.
13            Q.    Was there ever a time that I could call
14    another phone number besides the ███ phone number
15    that would cause your Pixel 4 Google to ring?
16            A.    Anecdotally, there may have been some
17    other numbers forwarded to the ███ number without my
18    knowledge or consent or control over that.  Some
19    defendants, for example, said they dialed a different
20    number, not ███, but somehow that number rang, so
21    that's what they said.
22            Q.    In this case?
23            A.    Not in this case.
24            Q.    Okay.  So it's your understanding -- are
25    you aware of a situation where somebody calls the
```



1 ▋ -- or somebody calls a different phone number

2 and the ▋ phone number rings?

3     A.   I can only tell you what people have told

4 me.

5     Q.   Okay.

6     A.   I don't know what they dialed.  I didn't

7 dial it.  I'm just saying what they told me.  That's

8 what they said.

9     Q.   Do you have any call forwarding set up on

10 your ▋ phone number?

11     A.   No.  If I dial ▋, it's going to ring to

12 ▋, yeah.  I'm associated with ▋.

13     Q.   Are there any phone numbers that forward

14 calls to your -- any other phone numbers besides the

15 ▋ phone number that forwards calls to your ▋

16 number?

17     A.   That's what I'm saying.  People have said

18 that it exists and that they called a different

19 number and it forwarded to the ▋ number.  I'm not

20 calling them liars.  I just -- that's what they said

21 and that's what I'm telling you what they said.

22     Q.   Have you ever witnessed such an

23 occurrence?

24     A.   Maybe once.  I think I tried on my own

25 maybe once.



1    Q.    And what happened?

2    A.    It didn't ring the ███ number, but I

3  didn't recognize the number that was being dialed.  I

4  just repeated the process they said they did to see

5  if it is possible.

6    Q.    Did you recognize the number that you were

7  dialing that ultimately rang to ███?

8    A.    No.  Like I was saying, that wasn't my

9  number.  I was just checking the feasibility if this

10  makes sense or not make sense.  Is it possible or not

11  possible.

12    Q.    And it did happen before your very eyes?

13    A.    Yes.

14    Q.    Did you ever look into why that happened,

15  ever ask Republic or anyone else?

16    A.    So, not to my knowledge, it was not a

17  public number, so I didn't really know who to ask.

18  It wasn't my number.  And I really wasn't even sure

19  who the service provider was or how or why this was

20  happening, so I don't have an answer to that

21  question.  It's not my number.  That's all I can tell

22  you.

23    Q.    You just never inquired other than seeing

24  it for yourself?

25    A.    Correct.



1        A.     Yes.

2        Q.     Okay.  Meredith, can you please show

3    Mr. Cunningham Exhibit 2?  I'm going to put this in

4    the chat function.  Mr. Cunningham, let me know when

5    you are able to view them.

6        A.     Yeah.  Go ahead.

7               (CUNNINGHAM EXHIBIT 2 WAS MARKED.)

8        Q.     (By Ms. Perkins)  What I'm showing you has

9    been marked CUNNINGHAM OO1 to OO8.  I'm sorry.

10   There's six zeros -- five zeros -- one, two -- five

11   zeros slash eight.  If you can scroll through these

12   documents, let me know if you recognize them.

13       A.     I do.

14       Q.     What are we looking at?

15       A.     These are phone bills from Republic

16   Wireless.

17       Q.     Where are they from?

18       A.     Republic Wireless.

19       Q.     Who acquired them for this litigation?

20       A.     I did.

21       Q.     How did you get them?

22       A.     I either had them or logged into the

23   account and downloaded them.

24       Q.     So if you turn to the first page, we have

25   a monthly service for February 11, 2019.  Does that



```
 1    -- the $64 figure, does that equate to what your

 2    monthly bill was?

 3            A.    As far as I know, yes.

 4            Q.    My Choice Talk & Text, you paid $15 a

 5    month for that, I see.  Did you have unlimited talk

 6    and text with this plan?

 7            A.    Yes.

 8            Q.    What is Republic Refund?

 9            A.    It's a program they have, I think.  It's a

10    program that Republic Wireless has and it's related

11    to data usage per month.  So if you come under a

12    certain amount of megabits, gigabytes, whatever, then

13    they give you a small portion back.  That's how I

14    understand it works.

15            Q.    In February 2019, we're seeing a bill for

16    the ████ phone number.  Underneath that it seems to

17    -- do you know what a Moto G5 Plus is?

18            A.    Yes.  It's a Motorola phone.

19            Q.    Is that the phone that would ring when the

20    ████ number was called in February of 2019?

21            A.    Yes.  That is the device that is

22    associated with the phone.

23            Q.    Do you still have that Motorola phone?

24            A.    I do.

25            Q.    Are you currently using it for any other
```



1    phone numbers?

2         A.    No.

3         Q.    If you turn to the third page.

4         A.    Yeah.

5         Q.    We have a July 2019 bill, also for the

6    ▇▇▇ phone?

7         A.    Yes.

8         Q.    Any idea why this statement has credit

9    card information on it and the one we looked at

10   previously did not?

11        A.    No idea.

12        Q.    Do you recognize the credit card that ends

13   in 7418?

14        A.    It vaguely seems like my family credit

15   card I've had in the past.

16        Q.    Do you currently have that credit card?

17        A.    Maybe, but I think the number has changed.

18   It expired or got hacked or something.

19        Q.    Well, it says the expiration date was

20   February of 2024.

21        A.    Correct.

22        Q.    So we're in 2021.

23        A.    Correct.

24        Q.    So you think that card number expired?

25        A.    Or, as I said, it got compromised, one way



1    or another, and they sent me a new card.

2         Q.    Do you know what bank or credit card

3    company this credit card was with?

4         A.    No.  I can't tell you offhand.

5         Q.    Were you the account holder for this

6    credit card?

7         A.    I was, yes.

8         Q.    If you go to the fifth page of the

9    documents.

10        A.    Okay.

11        Q.    We have a September 11, 2019 bill.  This

12   time we have an additional phone number,

13   ▮▮▮▮▮▮▮▮.  Do you recognize that phone number,

14   sir?

15        A.    Yes.

16        Q.    And why is that ▮▮▮ phone number

17   appearing on a September 11, 2019 bill from Republic

18   for the ▮▮▮ phone number?

19        A.    So they just included -- include all the

20   phone numbers that are associated with that account

21   and the email address with the bills.

22        Q.    So would it be fair to assume that if we

23   scrolled back up to the February 2019 statement in

24   February of 2019, you only had one cell phone number

25   associated with Republic?



1    A.    No.   There's another email address I had

2  that had one or two other phone numbers associated

3  with it.

4    Q.    And what are those email addresses?

5    A.    I think it was

6  graniteenterprisesllc@gmail.com.

7    Q.    And what are the other phone numbers?

8    A.    ███████████████████  are the other

9  two numbers, but, you know, at this time, I think I

10  had transitioned those two numbers to Verizon and

11  that's why, yeah.

12    Q.    Who uses these phone numbers?

13    A.    I do.

14    Q.    And for the phone numbers that have the --

15  that are associated with the Granite Enterprises

16  email address, do you use those phone numbers?

17    A.    Yes.

18    Q.    Why are they associated with the Granite

19  email address?

20    A.    I don't remember.  I think I got those

21  later.  Yeah, I think I got those later, so I had to

22  -- so say I had the ████ five years ago, and I

23  transitioned the other numbers to cell phones four

24  years ago.

25    Q.    Okay.  And does Granite pay for any of



```
 1    these cell phone numbers?

 2         A.    No.

 3         Q.    So switching back to the fifth page with

 4    the ▮▮▮ number, is that a number that you currently

 5    have?

 6         A.    Which one?

 7         Q.    The fifth page.  It's area code ▮▮▮ --

 8         A.    Okay.

 9         Q.    -- ▮▮▮▮▮.

10         A.    Yeah.  What about it?

11         Q.    Is that a phone number that you have?

12         A.    Not currently, no.

13         Q.    What are the dates that you had that phone

14    number?

15         A.    I don't recall the dates.  The only --

16    yeah, I'm not sure of the dates.

17         Q.    What did you use that phone number for?

18         A.    There was a phone I needed to get some

19    data or apps or files or something off of, and it was

20    just not working.  It was connected to "send."  So I

21    had to get service so I could get the files I wanted

22    off of it.

23         Q.    So there were files on a phone and you

24    were not able to access them without getting a phone

25    number --
```



```
 1          A.    Correct.

 2          Q.    -- associated with the phone?

 3          A.    Correct.

 4          Q.    What were those files?

 5          A.    I think they were called -- might have

 6     been screenshots of calls or something like that.

 7          Q.    For other TCPA cases?

 8          A.    Yes.

 9          Q.    Do you recognize the "Moto E (Black) (1st

10     Generation)" phone?

11          A.    Yes.

12          Q.    Do you currently have that phone?

13          A.    I do.

14          Q.    Is it currently being used?

15          A.    No.  That's an older -- that's an older

16     phone, so I retired that one from use.

17          Q.    And it looks like in this month, the

18     credit card that was used to pay for this ended in

19     4880 with the expiration of June 2022.  Do you

20     recognize that credit card?

21          A.    Yes.

22          Q.    What credit card is that?

23          A.    It's just a credit card.  I know the 4800

24     sounds familiar.

25          Q.    You don't know which credit card that is?
```



CITICOURT

THE REPORTING GROUP

1          A.    Not offhand, no.

2          Q.    How many credit cards do you currently

3    have?

4          A.    I have a few.  I've got at least five,

5    plus a -- yeah, probably five plus.

6          Q.    Does Granite Enterprises have any credit

7    cards?

8          A.    I think I have one credit card for -- in

9    the name of Enterprises.

10         Q.    Which credit card is that?

11         A.    American Express.

12         Q.    Is that a business card?

13         A.    Yes.

14         Q.    You can put that to the side.

15               Meredith, if you can please open up what

16   has been premarked as Exhibit 3.

17               THE WITNESS:  While she's getting that up,

18   could we take, like, a five-minute break?

19               MS. PERKINS:  Sure thing.

20               MR. PARONICH:  And I just know we're

21   around what will be 5:00 on the East Coast.  I'll

22   just need a bit of a longer break, like 5:15 now,

23   because I don't want to shortchange you on the next

24   round.  I'll just need like 30 minutes, around that.

25               MS. PERKINS:  Right now or closer to 5:00?



CITICOURT
THE REPORTING GROUP

 1                 MR. PARONICH:  At 5:15, I'll need 30

 2     minutes.

 3                 MS. PERKINS:  So would you like to take a

 4     five-minute break now, Mr. Cunningham?

 5                 MR. PARONICH:  Yes, please.

 6                 THE VIDEOGRAPHER:  Going off the record.

 7     1:55 is the time.

 8                 (Break)

 9                 THE VIDEOGRAPHER:  Returning on the

10     record.  The time is approximately 2:03 p.m.

11                 Counsel.

12                 (CUNNINGHAM EXHIBIT 3 WAS MARKED.)

13          Q.    (By Ms. Perkins)  Mr. Cunningham, if you

14     could please look in the chat box, Meredith has

15     uploaded what has been premarked as CUNNINGHAM 3.

16          A.    Yes.

17          Q.    Are you looking at that document, sir?

18          A.    I am.

19          Q.    Have you ever seen that document before?

20          A.    Yes.

21          Q.    What am I looking at?

22          A.    These are call detail records from

23     Republic Wireless reflecting some of the

24     telemarketing calls I received by or on behalf of

25     DSI, or, I'm sorry, by or on behalf of Vivint.



1      Q.    When did you receive this document?

2      A.    As I recall, summer 2019.

3      Q.    And this is a subpoena response --

4      A.    Yes.

5      Q.    -- is that -- okay.  So did you serve a

6  subpoena on Republic Wireless in the summer of 2019?

7      A.    I did.

8      Q.    Has that subpoena been produced in this

9  litigation?

10      A.    No.

11      Q.    And did you serve the subpoena before you

12  were a party in this litigation?

13      A.    I'm not sure of when I served it other --

14  other than to say it was not related to this case.  I

15  just got information that is partially related to

16  this case through the --

17      Q.    And do you have a copy of that subpoena?

18      A.    I don't think so.

19      Q.    So apart from you telling me that you

20  subpoenaed this record, do you have any other

21  documentary evidence of where this document came

22  from?

23      A.    There's a certificate or the -- from the

24  facility of the records, there is an affidavit where

25  they authenticate these records.



 1       Q.   And where is that custodian of records

 2   affidavit?

 3       A.   I thought we produced it.  If we didn't,

 4   I'm sure it's something that I can get.

 5       Q.   Yeah.  We'll ask for that and a copy of

 6   the subpoena.  It also has -- it also lists 505

 7   pages.  Did you receive all 505 pages?

 8       A.   Yes.

 9       Q.   And why were they not produced in this

10   litigation?

11       A.   Because it's outside of the scope of the

12   relevancy and it's simply about all calls.  Those are

13   all calls that were inbound and outbound for the

14   Republic Wireless account for that time frame.

15       Q.   And who determined that it was outside of

16   the scope of this case?

17       A.   I did.

18       Q.   Okay.  And what has been blacked out?

19       A.   These are other calls that are unrelated

20   to calls by or on behalf of Vivint.

21       Q.   Did you black out these other calls?

22       A.   Yes.

23       Q.   So you have the original document without

24   the black outs that was produced to you?

25       A.   I do have unredacted documents, yes.



Craig Cunningham  *  June 08, 2021                    278

1          A.    That's the primary source of revenue, yes.

2          Q.    What is the other source of revenue?

3          A.    There might be some interest and payments

4   like that.

5          Q.    Interest in what?

6          A.    So banks pay interest, stocks pay

7   dividends, bonds pay coupons.  There's other ways of

8   generating income other than selling stock.

9          Q.    Does Granite Enterprises hold stock?

10          A.    I know I have a brokerage account in its

11   name.  I don't think I trade through that right now.

12          Q.    Does it currently hold stock?

13          A.    Again, I've really got to get all my 1099s

14   and all of that stuff together, see what all the

15   sources of income are.  But I'm just saying I

16   wouldn't rule out getting some interest payments from

17   the bank or other financial institutions.

18          Q.    Apart from making income on interest and

19   potentially dividend payments or other stocks, does

20   Granite Enterprises make any other income from

21   consumer sources besides the Amazon eCommerce

22   platform?

23          A.    What is a consumer source?

24          Q.    An individual or an entity purchasing

25   services or products from Granite Enterprises.



 1           A.    No.  That's it, primarily Amazon.

 2           Q.    What is your top-selling product through

 3     Granite Enterprises?

 4           A.    It really depends.  Products vary, such

 5     when the industry is very -- it's quite varied.

 6     Companies and consumer taste change all the time.

 7           Q.    What was it last month?

 8           A.    I don't recall last month.

 9           Q.    Can you name me five things that Granite

10     Enterprises sells to consumers on Amazon?

11           A.    Sure.  Protein powder for workouts.  Most

12     of your major supplement brands, I've sold stuff to

13     them, or sold their products over the years.  But

14     certain things work out well and certain things don't

15     move so fast.

16           Q.    Again, under what trade name or business

17     name are the products being sold under?

18           A.    It's not really how it's done.

19           Q.    How is it done, Mr. Cunningham?

20           A.    So I buy products, such as VPX Bang, and

21     they get listed on Amazon.  If you want to buy a

22     12-pack of VPX Bang, go on Amazon.  Pull up whatever

23     flavor you want and it may be selling it or it may be

24     somebody else selling it.  It could be Amazon or any

25     other third-party seller.  And you order one and they



 1  ship it to you and they charge your credit card and I

 2  get the portion minus Amazon's fees.

 3       Q.    And where do you store the products?

 4       A.    We store it at Amazon.

 5       Q.    Do you pay Amazon to store the products?

 6       A.    Yes, as part of the program process,

 7  basically.

 8       Q.    How much money do you pay Amazon monthly?

 9       A.    Again, it's not really how it's done.  You

10  pay a percentage, which is about 30 percent of the

11  gross, and that covers all the fees and costs and

12  whatever.

13       Q.    What was your gross last month for your

14  Amazon sales?

15       A.    I haven't looked.

16       Q.    You haven't looked?

17       A.    No.

18       Q.    When is the last time you reviewed the

19  gross of your sales at Amazon?

20       A.    Per month or -- I usually look at it on a

21  daily basis, I look at it.

22       Q.    When is the last time you looked?

23       A.    It's been a few months.

24       Q.    Does anyone else look at those numbers for

25  you and report them to you?



 1      A.    No.

 2      Q.    How do you know if your business is doing

 3  well or not doing well if you don't look at your

 4  sales?

 5      A.    It's not -- I look at it more as

 6  inventory.  Is inventory moving, what products I need

 7  to sell, what products I need to get, if there is

 8  something new, specials they have, things like that.

 9  I'm more focused on the operation of it.

10      Q.    Do you have a business manager that

11  reviews how the company is doing?

12      A.    I review how the company is doing.

13      Q.    Okay.  And the last time you reviewed how

14  the company was doing was a couple of months ago?

15      A.    That's not what I said.  What I'm saying

16  is I don't look at it the way you're describing it.

17  That's not how I look at it and think about it.  I

18  look at what products are selling, what's not

19  selling, new products, things like that.  Some of

20  them are closeouts and discounts.  Should I buy this,

21  should I not buy this?  I know the stuff is pretty

22  much going to sell, and beyond that, I settle up with

23  the IRS at the end of the year.

24      Q.    Did you pay taxes in 2019?

25      A.    Yes.



 1      Q.    And did you file taxes in 2019?

 2      A.    I would have to look.  I can't remember

 3   the last year I filed, if it was 2019.

 4      Q.    Okay.  Where would you look to determine

 5   if you filed taxes in 2019?

 6      A.    I would have to check with the IRS.

 7      Q.    And you don't know that, sitting here

 8   right now, whether you filed taxes in 2019?

 9      A.    Like I said, I'm a little bit behind on

10   it, but I'll get caught back up shortly.  I had

11   another issue I had to deal with the IRS on.

12      Q.    And what is the reason for being behind in

13   your taxes?

14      A.    I had another issue I had to deal with the

15   IRS on where they were saying I owed money and I

16   didn't owe them money and I had to get their

17   attention -- their attention on that issue.

18      Q.    Did that issue have anything to do with

19   the TCPA settlement payments that you received?

20      A.    No.

21      Q.    And how do you report those TCPA

22   settlement payments?

23      A.    They would be reported as income.

24      Q.    And how much money did you make in income

25   in 2020 from TCPA settlement payments?



1     A.    I don't know.  Like I said, I haven't done

2     ████████████████

3          ████████████████████████

4          ████████████████████

5          ████████████████████████

6          ██████████████████████████████

7       ████████████████

8          ████████████████████

9        ████████████████

10         ██████████████████████████

11   ██████████████████████

12     Q.    Yeah, those are details.  On Amazon, when

13   I go on Amazon and look at Granite Enterprise, does

14   the display name "Best Sups For You" mean anything to

15   you?

16     A.    Yes.  That is a display name.

17     Q.    And is that your Granite Enterprises?

18     A.    Yes.

19          MS. PERKINS:  Meredith, can you please

20   show Mr. Cunningham -- bear with me -- number 19?

21     Q.    (By Ms. Perkins)  Mr. Cunningham, what I'm

22   showing you has been produced by you, double --

23   sorry, quadruple zero 66.  It is an "Account

24   Information - Citi Online."  Do you recognize that?

25     A.    Yes.



Craig Cunningham  *  June 08, 2021                                        284

 1                    (EXHIBIT 12 WAS MARKED.)

 2          Q.    (By Ms. Perkins)  What am I looking at?

 3          A.    It's a credit card statement showing a

 4    transaction involving Vivint.

 5          Q.    So in or around October 5th of 2020, you

 6    signed up for Vivint services?

 7          A.    Yes.

 8          Q.    And I think I have learned this today, but

 9    every time you receive a telemarketing call, you sign

10    up for services as if they are available in order to

11    determine who's actually selling or promoting the

12    product?

13          A.    That's not what I said.

14          Q.    Okay.  Why did you sign up for Vivint

15    services on October 5th of 2020?

16          A.    I signed up on October 5th because I

17    received what I thought was a call from Vivint that

18    violated the TCPA and to confirm who was calling, and

19    it was -- and to confirm it was actually Vivint, I

20    signed up for services.

21                MS. PERKINS:  Meredith, can you please

22    show Mr. Fitzhenry Number 20?  I'm sorry.  I called

23    you Mr. Fitzhenry.  I apology.

24                And I would like to mark this one as

25    Exhibit 13.



 1                    (EXHIBIT 13 WAS MARKED.)

 2          Q.    (By Ms. Perkins)  Mr. Cunningham, do you

 3   recognize the document that is entitled, "Settlement

 4   and Release Agreement"?

 5          A.    Yes.

 6          Q.    And what is this document that we are

 7   looking at?

 8          A.    It's a settlement involving myself,

 9   Vivint, DSI and Trips Marketing.

10          Q.    And this was in relation to telemarketing

11   calls or text messages that you received?

12          A.    Correct.

13          Q.    Was there a lawsuit ever filed in regards

14   to these claims?

15          A.    No.

16          Q.    And did you negotiate on your behalf for

17   the settlement?

18          A.    Yes.

19          Q.    Who did you discuss -- who did you

20   negotiate with to come to this settlement?

21          A.    Rich Goates and I may have talked with

22   someone at DSI or someone, but definitely Rich

23   Goates.  He was the main point of contact.

24          Q.    And how many calls did you receive or text

25   messages that were the subject of this release?



 1      A.   I don't recall the exact number.  It was
 2  north of 60, as I recall.
 3      Q.   North of 60, six zero?
 4      A.   Six zero, yes.
 5      Q.   What phone number or phone numbers
 6  received this call, these calls?
 7  ████████████████████████████████████████████
 8  ████████████████████████████████████████████
 9  ████████████
10      Q.   And by signing this Settlement Agreement,
11  what were you releasing?
12      A.   My claims up to the day of the signature.
13      Q.   And what claims were those?
14      A.   Claims related to violations of TCPA.
15      MS. PERKINS:  Meredith, you can put that
16  to the side.  Please show Mr. Cunningham number 21.
17      THE WITNESS:  Okay.
18      (EXHIBIT 14 WAS MARKED.)
19      Q.   (By Ms. Perkins)  Mr. Cunningham, this was
20  produced in this litigation, CUNNINGHAM 4078.  Have
21  you seen this document before?
22      A.   Yes.
23      Q.   And what is this document?
24      A.   It looks like a summary of phone calls
25  involving Vivint.


CITICOURT
THE REPORTING GROUP

1     Q.    And when you previously looked at your

2  ███ phone to confirm whether or not the calls or

3  text messages in this litigation -- I'm sorry --

4  your ███ phone number -- phone to determine whether

5  there were any text messages or calls to that number

6  in this litigation, you said that you looked at some

7  notes.  If you look at column H, are those the type

8  of notes that you just looked at?

9     A.    No, I don't think so.  I think those are

10 just notes I made based on the call.

11    Q.    And did you make these notes?

12    A.    Yes.

13    Q.    And did you create this spreadsheet?

14    A.    Yes.

15    Q.    Did you make this -- do you make these

16 notes contemporaneous to the receipt of a telephone

17 call or text message, or do you wait until you bring

18 litigation?

19    A.    So it's not a set process.  I mean, I made

20 notes and, as I recall, for this, making this

21 spreadsheet, I listened to the calls and typed in any

22 particular notes that I thought were relevant or

23 important to highlight.

24    Q.    Looking at this first, February 25, 2019

25 date and time, there is a summary of the call.  Do

